**Dorothy HERBERT, Appellant,**

v.

**Hansel Kay HERBERT, Appellee.**

**No. 2–84–197–CV.**

Court of Appeals of Texas,
Fort Worth.

Nov. 30, 1988.

Rehearing Denied Aug. 3, 1989.

Raymond D. Noah, Raymond D. Noah & Associates, Richardson, for appellant.

Gayle E. Oler, Dallas, for appellee.

Before FENDER, C.J., and JOE SPURLOCK, II and HUGHES (Retired, Sitting by Assignment), JJ.

## OPINION ON REMAND

FENDER, Chief Justice.

This case has been remanded to this court by the Texas Supreme Court for a redetermination of appellant's seventh

point of error which asserts that the jury's negative finding to the sole special issue[1] submitted is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Herbert v. Herbert*, 754 S.W.2d 141 (Tex.1988).

We reverse and remand.

A detailed account of the procedural history of this case can be found in our prior opinion, 699 S.W.2d 717. However, for the reader's benefit, we will set out the pertinent proceedings in the case. Appellant, Dorothy Herbert, sued her former husband, Hansel Kay Herbert, to collect 50% of his military retirement benefits pursuant to the property settlement agreement contained in their divorce decree. Hansel defended by asserting that Dorothy was not entitled to specific performance because she had materially breached the agreement by refusing to give him certain items of his personal property, as specified in the decree. Upon the jury's finding that Dorothy had not substantially complied with the duties and obligations required of her under the property settlement agreement contained in the divorce decree, the trial court rendered a take-nothing judgment against Dorothy.

Dorothy's seventh point of error contends the jury's verdict was "so against the great weight and preponderance of the evidence as to be manifestly unjust and therefore there was insufficient evidence to support the Jury's verdict."

The trial court submitted the following special issue in the charge to the jury:

*SPECIAL ISSUE*

Do you find from a preponderance of the evidence that Dorothy Herbert substantially complied with the duties and obligations required of her under the property settlement agreement contained in the divorce decree dated August 12th, 1977.

In answering the above and foregoing Special Issue you are instructed that substantial compliance as used in this Special Issue is a performance of all important particulars and permits only such omissions or deviations from the agreement as are inadvertent and unknowingly and was [sic] not due to bad faith.

Answer "She did substantially comply" or "She did not substantially comply".

ANSWER: *She did not substantially comply.*

In reviewing a point of error asserting that a jury's answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *Ford Motor Co. v. Nowak*, 638 S.W.2d 582, 585 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). So considering the evidence, if a jury finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt*, 159 Tex. 305, 320 S.W.2d 815, 816 (1959) (per curiam); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam).

The Supreme Court of Texas has cautioned the courts of appeals in factual insufficiency cases to detail the evidence relevant to the issue in consideration and clearly state "why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (opinion on reh'g). Further, the supreme court has specified that in our opinions we should state in what regard the contrary evidence greatly outweighs the evidence in support of the jury's verdict. *See id.; see also Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986) (per curiam).

---

1. The jury trial was prior to the enactment of the recent version of TEX.R.CIV.P. 277 whereby the supreme court established that a trial court shall submit "questions" to the jury, as opposed to "special issues." We shall use the term "special issues" in this opinion so as to maintain continuity with the proceedings in the trial court.

If a jury makes a negative finding in answer to a question within the charge, it means that the party with the burden of proof has failed to carry its burden of proving that fact. *Grenwelge v. Shamrock Reconstructors, Inc.*, 705 S.W.2d 693, 694 (Tex.1986) (per curiam); *Siderius, Inc. v. Wallace Co., Inc.*, 583 S.W.2d 852, 861 (Tex.Civ.App.—Tyler 1979, no writ). In considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence. *See Herbert*, 754 S.W.2d at 144. Therefore, the supreme court has instructed us in the instant case that "[r]eversal would be warranted only after a detailing of evidence under the *Pool* criteria indicates that the *great* weight of that evidence supports an affirmative answer." *See id.* (emphasis in original).

In his pleadings, Hansel claimed Dorothy had materially breached the divorce decree because she had refused to deliver to him numerous items that had been awarded him in the decree. The decree awarded Hansel approximately 130–140 specific personal items as his separate property.[2] Additionally, the decree awarded Hansel the following items which were not specified in exact number:

Father's miscellaneous papers

Navy military service papers, records and medals personal to Hansel Kay Herbert

Property personal to Hansel Kay Herbert

33⅓, 45 and 78 rpm records, record albums, cassettes, and 8 track tapes

WWI and WWII books

Books about music, musicians, etc.

Miscellaneous clothing personal to Hansel Kay Herbert

Miscellaneous airplane model kits

Seven hundred to eight hundred 78 rpm records with wood cruise box

Two to three hundred 33⅓ rpm records

Miscellaneous text books, chart board (navigational), uniforms in wardrobe trunk, etc.

Heirloom pictures and frames pertaining to the ancestors of Hansel Kay Herbert

35 mm slides and 8 mm movies taken by Hansel Kay Herbert, except those of Jimmy Herbert, Petitioner and her family

Two large cases of tapes

Tax records

Cancelled checks and bank statements and other financial records

Insurance policies and employment documents of Hansel Kay Herbert.

Hansel alleged in the instant lawsuit that he was missing:

Numerous family heirloom pictures, albums, letters, newspapers, etc.

Herbert Family Bible.

A large number of 33⅓, 45 and 78 rpm records or albums, cassettes and 8–track tapes, including but not limited to those listed on Exhibit A attached hereto.[3]

Two World War Two field telephones.

Many heirloom pictures and frames pertaining to the ancestors of Hansel Kay Herbert.

Several out of a collection of 10 to 12 reels of recorded tapes.

8 to 10 boxes of slides with four trays to the box.

One large reel (composed of several smaller reels of film spliced together) of 8 mm color movies taken overseas, while Respondent was on active duty in the US Navy.

Insurance policies and employment documents of Hansel Kay Herbert

Volume 10 of *Pictorial History of Civil War.*

One set of opera-type binoculars.

---

2. Many of these items were listed as an approximate number; e.g., "Ten-fifteen assorted bottles of liquor." This 130 number does *not* include the award of any money in checking or savings accounts, or any pension or military retirement benefits.

3. Exhibit A is a handwritten list stating that Hansel is missing: "40 to 50 (33⅓ albums)," including 21 enumerated artists and/or album titles; "Undetermined number of 45's;" "50 to 100 78's," including approximately 26 enumerated artists and/or record titles.

The evidence presented at trial consisted of the testimony of the parties, their daughter, and two of Dorothy's friends. The testimony established that after the parties' divorce decree was signed on August 12, 1977, their attorneys made arrangements to have Hansel pick up the numerous items of personal property which had been awarded him in the decree. Inasmuch as Dorothy was in possession of the residence, where these items were stored, she was given the responsibility of assembling in one place all of these items for Hansel to remove. Dorothy testified with regard to the mechanics of this procedure that the night before this prearranged date in September 1977, she and four other people had the divorce decree in front of them and each person assumed responsibility for gathering up various things that were listed in the divorce decree; at that point each item was checked off of the master list. They then rechecked the list three or four times to verify that everything listed in the divorce decree was gathered together. The next day Hansel arrived in a large moving van to remove these amassed items. Dorothy stated that this removal procedure took two hours and Hansel left, apparently satisfied that he had received everything he was entitled to. Two of the four people who had assisted Dorothy testified at trial and basically substantiated her version of these events.

Hansel testified that when he picked up the property he consulted his list and to the best of his ability checked off the items awarded to him, but was unable to completely inventory each box because Dorothy had placed the boxes outside on the driveway and rain drops began falling. However, appellee did inventory the books and records when he got them to his home, at which point he realized that numerous items had been omitted. He then contacted Bonita Marti, Dorothy's friend and employer and one of the persons helping her to compile Hansel's property, and gave her a list of the omitted items. Approximately a month later Marti left a box at Hansel's office containing some of the items; however, appellee still complained that many items were missing. Dorothy's response was that she and her friends had laboriously verified two or three times that all of the items listed in the divorce decree and awarded to appellee had actually been grouped together and picked up by him.

Shirley Anne Zahn, Dorothy's sister, testified that when they were grouping these items, all of the people shared responsibility for checking and verifying certain portions of the list, and they then did a final check with all of the helpers present, whereupon the total amount of items was put out onto the driveway, and the garage doors were closed.

The parties' daughter, Brandy Kay Herbert, testified that she visited her mother during the Thanksgiving holidays in 1977, after her mother and father were divorced. Since she had not had any contact with nor seen her mother in about two or three years, and had been recently married that summer, she decided to introduce her husband to her mother and she tried to re-establish communications. While Brandy was there she inquired specifically about certain items which she stated had belonged to her as a child and which she would like to pass on to her son. She testified that Dorothy informed her that the items were not there; however, the daughter stated that she looked around the house without her mother's permission and found these items in a closet.

Additionally, in the same closet she noticed several items which Hansel now claims were not given to him, but which Dorothy still contends she did in fact relinquish to Hansel. The daughter testified that Dorothy then tried to physically throw her out of the house and threatened to call the police, and finally ran out into the yard screaming for help from the neighbors, stating that someone was burglarizing her home. The daughter did relate that she removed from Dorothy's house a train set and a set of bronzeware eating utensils (approximately 109 pieces), and we note the divorce decree specifically awarded these items to Dorothy.

In rebuttal, Dorothy testified that on the occasion just mentioned her daughter and other people arrived unexpectedly at her

back door, came into the house and everyone exchanged pleasantries for ten or fifteen minutes, whereupon her daughter went out into the garage and searched it, finding the train set and set of bronzeware. She further stated that her daughter then physically struck her and flung her over the back porch into the backyard, and down three steps. She was badly bruised and scratched and began screaming for help from the neighbors. Bonita Marti verified that the day following this incident she observed Dorothy at work—Dorothy was very distraught and it appeared that she had been hit in the stomach, and had many bruises on her body and arms.

The only other testimony relating to whether Dorothy substantially complied with the terms of the divorce decree by furnishing all of the requested items to Hansel, dealt with an incident which occurred on October 22nd, approximately a week after the divorce was final. This was after Dorothy had boxed up Hansel's possessions and he had retrieved them. The parties agreed that Hansel came over to Dorothy's house uninvited and walked in through the open back door, startling Dorothy, and against Dorothy's will proceeded to remove several items from the house. Specifically, Hansel removed a nine-volume set of Civil War encyclopedias and other books as well as some of his military papers. Both parties are in further agreement that Dorothy indicated she would call the police, and in fact did call the police on this occasion. However, the parties' recollections of this scene then greatly diverge with Dorothy testifying that Hansel shoved her around, she was bruised, scratched, and bleeding and was trying to get help. Bonita Marti testified that the next day Dorothy had a rather large bruise on one thigh or hip, her arm was badly bruised and skinned, there was a bruise on one side of her face that looked "horrible," and there were some marks on her arms, appearing as though somebody had grabbed her. Hansel thoroughly disputed this version of the incident.

We will now set out in detail the testimony relating to all eleven categories of items that Hansel listed in his pleadings as not having been delivered to him by Dorothy.

1. *"Numerous family heirloom pictures, albums, letters, newspapers, etc."*

Hansel testified he had not received framed pictures of his relatives who had been in the American Revolutionary War—the pictures had been hanging on the wall in the parties' house. Also missing were picture albums of Hansel's family, and letters that were written to Hansel's grandmother from his grandfather when he was stationed in Paris, France during World War I. Additionally, Hansel should have received letters from his great great grandfather to various people.

With regard to this category, Dorothy stated she checked all these items off the divorce decree and delivered them to Hansel.

2. *"Herbert Family Bible"*

Hansel testified that this item was never received by him. Shirley Zahn stated that she saw this Bible while they were packing Hansel's possessions in the garage, but did not pay much attention to it. At trial, Dorothy did not mention this Bible.

3. *"A large number of 33⅓, 45 and 78 rpm records or albums, cassettes and 8-track tapes, including but not limited to those listed on Exhibit A attached hereto"*

The divorce decree awarded Hansel two to three hundred 33⅓ r.p.m. albums. Out of this number, Hansel testified he never received twenty-two albums. Hansel acknowledged at trial that he had received all of his 45 r.p.m. records. Hansel was awarded seven to eight hundred 78 r.p.m. records; he testified he is still missing approximately twenty-eight 78 r.p.m. records. Additionally, Hansel stated he is missing a cassette of their child, Brandy.

On the other hand, Dorothy testified that she only had 10 records that belonged to her, and that is the number she retained. She related that when Hansel barged into the house on October 22nd, she saw him

taking some records that appeared to be their grandson's.

Shirley Zahn stated that Hansel's custom-made record boxes were "jammed full of records." Bonita Marti testified these boxes were already packed by Hansel and the people assisting Dorothy did not disturb the boxes.

4. *"Two World War II field telephones"*

Although Hansel testified that these items were missing, Dorothy stated that she thought her brother-in-law placed these items in the garage the night before Hansel arrived in the moving van to remove his possessions; when Hansel left, Dorothy observed that the garage was empty.

The parties' daughter, Brandy, testified that during her Thanksgiving visit she saw the two World War II field telephones in a closet in Dorothy's house.

5. *"Many heirloom pictures and frames pertaining to the ancestors of Hansel Kay Herbert"*

Hansel's total testimony regarding this category was: "Those are pictures of different family members. I don't recall exactly what those were."

6. *"Several out of a collection of 10 to 12 reels of recorded tapes"*

Hansel's testimony in this regard consisted of: "There were several reels of recorded music, some of which were done at a dance job that I played with some friends of mine. Another I played on our daughter's graduation night. I had the band play for her graduation so I recorded that that night. I don't have that."

Brandy stated that during her Thanksgiving visit she saw "[s]ome of the reels of recorded tape" in Dorothy's house.

Dorothy testified that she has no idea what Hansel is referring to, and that every box of film and all tapes were placed with Hansel's items.

7. *"8 to 10 boxes of slides with four trays to the box"*

Hansel testified "I was to get all of the slides except the ones belonging to all that

involved her family and our child. Each of these boxes had four trays in them so there were lots of 35mm slides that were taken on vacation trips that did not involve our child or her family. I got none of those back."

Brandy stated that during her Thanksgiving visit she saw several boxes of 35mm slides in Dorothy's closet, and "eight to ten boxes of slides with four trays to the box, quite a few of those [in Hansel's pleadings], if not all of them were there."

Dorothy, however, insisted that she literally spent weeks viewing the slides the parties owned, and she put all of those designated for Hansel into his stack of items.

8. *"One large reel (composed of several smaller reels of film spliced together) of 8mm color movies taken overseas, while Respondent was on active duty in the US Navy"*

Hansel disputed receiving this item.

Brandy testified that during her Thanksgiving visit she "noticed that the box containing the cans of film from [Hansel's] military service and that he used to show all the time were still up in the closet on a shelf in the closet that used to be his back in the back bedroom."

Dorothy stated that she doesn't know what the 8mm color movies look like, but that all the movie equipment, including the projector, went to Hansel. She related that while she was compiling Hansel's items, if she "opened a box and it was film or tape it went in his stack." She said she had spent many, many hours going through each slide and giving Hansel anything that had to do with himself, his family, or his naval career.

Shirley Zahn testified there was a box of movie film packed in Hansel's boxes. She doesn't remember what size, or the content thereof, but said "there were tons of film we put out there for him."

9. *"Insurance policies and employment documents of Hansel Kay Herbert"*

Dorothy stated that all these documents were delivered to Hansel before the decree

became final; Hansel acknowledged at trial that he "may have received those through her lawyer and they were just left on [the pleadings] and not crossed off."

**10.** *"Volume 10 of Pictorial History of Civil War"*

The divorce decree awards the 10-volume Civil War Encyclopedia to Hansel for his lifetime, and on his death to the grandson, Jeffrey, specifying Jeffrey may have the set "when he is old enough to enjoy them."

It is undisputed that Hansel retrieved nine of these volumes during his uninvited post-divorce entry, and Dorothy said that on that occasion Hansel dropped the tenth volume—which was not part of the original set and which Dorothy testified was therefore essentially valueless, but which she had acquired at some point during the marriage so as to complete the set.

Dorothy stated she had not included the set of Civil War Encyclopedias in the items she boxed for Hansel, because their grandson's mother, Brandy, had determined the grandson was now old enough to enjoy these books. Brandy was not asked about this statement.

**11.** *"One set of opera-type binoculars"*

Hansel testified that this item was in a leather box that had his name on it, and the binoculars had belonged to his grandmother.

Dorothy indicated that she only found one pair of binoculars in the house and was unsure whether they were "opera-type." She testified that she put these binoculars into Hansel's boxes.

### Conclusion

After a thorough review of all the evidence in the record, we find that the great weight and preponderance of the evidence supports an affirmative answer to the special issue submitted, and that the jury's negative finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *See Herbert*, 754 S.W.2d at 144. The great weight of the evidence shows that Dorothy performed all important particulars required by the divorce decree and that any omissions or deviations were committed inadvertently and unknowingly. Appellant's seventh point of error is sustained.

In accordance with the instructions from the supreme court, we have re-evaluated only the sufficiency of the evidence challenge in appellant's seventh point of error. Our ruling on this particular point does not otherwise affect our prior opinion of November 27, 1985, 699 S.W.2d 717. Nor is it our intention to advise the trial judge that upon retrial of this case he is precluded from considering the post-divorce conduct of the parties, or any other relevant evidence that may be introduced.

The judgment is reversed and the cause remanded for retrial in all aspects.