**Reuben A. ISERN, M.D., Appellant,**

v.

**Helen WATSON and Rix Watson, Appellees.**

**No. 09–95–344 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Dec. 5, 1996.

Decided March 20, 1997.

188

Denice Smith, Houston, Jo Ben Whittenburg, Orgain, Bell & Tucker, Beaumont, for appellant.

John H. Holloway, Houston, for appellee.

Before BURGESS, STOVER and CARR, JJ.

## OPINION

CARR, Justice[1].

This is a medical malpractice case which arises out of appellees Helen and Rix Watson's claim that appellant, Dr. Reuben A. Isern, was negligent in failing to properly diagnose and treat Mrs. Watson, or to seek a consultation from a specialist, during her visit to a hospital emergency room after a fall. The Watsons claimed at trial that the alleged acts or omissions of Dr. Isern caused Mrs. Watson's leg to be later amputated at the knee.

This appeal is from a retrial of this case and is the second time the case has been appealed to this Court. In the first trial, the jury awarded zero damages to the Watsons and the trial judge rendered judgment that the Watsons take nothing. *Watson v. Isern*, 782 S.W.2d 546 (Tex.App.—Beaumont 1989, writ denied) (Brookshire, J., writing).

In the second trial, the jury found that Dr. Isern was negligent in failing to hospitalize Mrs. Watson for further evaluation and negligent in failing to do a "Doppler" exam to assure that there was no major damage to a blood vessel. The jury awarded Mrs. Watson $1,432,600 and Mr. Watson $9,000 in damages. With reduction of the damages by 35% for contributory negligence, the trial court rendered judgment for damages, with prejudgment interest, in the amount of $3,091,495.43, plus post-judgment interest and cost.

Dr. Isern has appealed asserting eight points of error. The Watsons, in five cross-points, have appealed the jury's 35% apportionate finding that Mrs. Watson was negligent in failing to return to the emergency room or seek other medical care prior to

seeing another doctor on Tuesday, following her injury on Saturday. We affirm.

### Evidence

On May 1, 1982, Mrs. Watson fell and injured her right leg. She weighed 270 pounds at the time. She arrived at the emergency room of a Beaumont hospital at 11:50 p.m. where Dr. Isern saw her. She complained of pain in the right knee, lower leg and ankle.

After X-raying her and finding that the leg was not broken, but finding that there was some damage to the knee joint area, Dr. Isern discharged Mrs. Watson. She was to remain in bed for two or three days, applying ice packs to the knee. Tylenol pain medication was prescribed.

The hospital records reflect her discharge at 1:50 a.m. Sunday morning; it took her family about 30 to 40 minutes to get her into a car to go home. The Tylenol prescription was filled early Sunday morning and she took it for pain, kept the ice packs on her leg as instructed, and remained in bed except to be helped to the bathroom by her family.

Mr. Watson talked with Dr. Isern or his office early Monday morning, and while Mrs. Watson could not detail the two-sided telephone conversation, it was her understanding she was to continue with the prescribed treatment by Dr. Isern.

On Tuesday morning, Mrs. Watson called her orthopedic doctor, Dr. Shorkey. He was unavailable, so she went to see his partner, Dr. Alfred Bessell. Dr. Bessell referred Mrs. Watson across the street to St. Elizabeth Hospital. At St. Elizabeth, she was seen by a vascular surgeon, Dr. Gordon. He referred her to John Sealy Hospital in Galveston where she arrived on the evening of Tuesday, May 4, 1982.

Mrs. Watson spent almost a month at John Sealy. After several procedures on her leg, the Galveston doctors finally removed it, be-

1. The Honorable Ron Carr, sitting by assignment pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

cause of lack of proper blood supply due to a ruptured popliteal artery.

At trial, the Watsons contended that Mrs. Watson's ruptured popliteal artery was a result of the fall on the night of May 1, 1982, before she came to see Dr. Isern and that Dr. Isern was negligent in his examination, his diagnosis and treatment of Mrs. Watson, and that it resulted in the loss of her leg.

Medical experts testified that when a popliteal artery is severed, as Mrs. Watson's was found to be at the time of her hospitalization at John Sealy, the blood supply is cut off below the knee, and there is a window of 6–8 hours from the severance within which surgery must be performed to save the leg.

Dr. John Mayo, a board certified emergency room physician who has been in charge of the Baptist Hospital ER since 1987 or 1988, and who worked with both Dr. Isern and Nurse Lannelle (Hussey) Wilson at the Baptist Hospital ER at the time of Mrs. Watson's ER visit, testified that in his medical opinion, Dr. Isern treated Mrs. Watson correctly; and, in his medical opinion, based on reasonable medical probability, Mrs. Watson did not have a ruptured popliteal artery when Dr. Isern treated her in the ER. Part of the basis for his opinion was that a patient with a ruptured popliteal artery would have an elevated pulse of at least 120, and Mrs. Watson's was 103; that she would not have had a pulse in her foot, while Dr. Isern's medical records noted she did have a foot pulse; and, that her knee would have been gangrenous by the time she was operated on at John Sealy on Wednesday, five days after her Saturday fall and a gangrenous leg is not reflected in the Sealy operative report of her first surgery.

Mrs. Watson's subsequent treating physician, Dr. Bessell testified that there is no way to tell how long the severed popliteal artery findings had been present. He could only say that the injury had been present several hours. If Mrs. Watson had a twisting fall with dislocation a day or even two days after she left Dr. Isern's care in the ER, that would be consistent with what he and Dr. Gordon found.

Dr. Mayo further testified that in his opinion, Dr. Isern's chart of his physical exam revealed that he gave Mrs. Watson an appropriate exam, and that Dr. Isern's recommendations of bed rest, elevating the knee, and ice packs were appropriate for Dr. Isern's diagnosis.

Dr. Barbee, also a board certified emergency room physician, testified on Dr. Isern's behalf, that based upon his review of the medical records in the case and his personal knowledge, training and experience as an emergency room physician, in his opinion Dr. Isern treated Mrs. Watson properly, did a proper examination of Mrs. Watson, and made proper records in the case. Dr. Barbee further testified that had Mrs. Watson been injured to the extent she claimed, it would have been very apparent to Dr. Isern that Saturday night. Instead, Dr. Barbee raised the issue of another possible fall.

Additional factual details of this case will be stated in connection with the points to which they pertain.

### Appellant's Appeal

Dr. Isern's first point of error contends that the trial court erred in submitting jury question one[2] because (1) it was not submitted broad-form in violation of the TEX. R.CIV.P. 277, and (2) resulted in conflicting jury findings.

### Standard of Review

The standard of review for error in the court's charge is abuse of discretion. *Texas Dept. of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). An abuse of discretion occurs when the trial court acts without reference to guiding principles. *Id.*

Where error in the charge has occurred which caused the jury's finding to be in conflict, a legal question is presented for the appellate court. *Bender v. Southern Pacific Transportation Co.*, 600 S.W.2d 257, 260 (Tex.1980), the Supreme Court explained the test for determining whether jury findings conflict:

2. Jury question one with the jury answers is attached to this opinion as Exhibit A.

A court may not strike down jury answers on the ground of conflict if there is any reasonable basis upon which they may be reconciled.... We do not determine whether the findings may reasonably be viewed as conflicting; to the contrary, the question is whether there is any reasonably possible basis upon which they may be reconciled.

### Broad–Form Submission

■ TEX.R.CIV.P. 277 does not support appellant's argument that the practice of submitting a jury question that encompasses more than one independent ground of liability in the same question, known as "broad-form submission", is mandatory in Texas or that our trial courts have "no discretion" in submission of the charge. Rule 277 specifically directs that a broad-form submission be given only "whenever feasible". .

Also contrary to appellant's "mandatory" argument is the holding by our Texas Supreme Court in *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex.1992):

Because Warner tendered a proper broadform question with appropriate instructions, the trial court should have granted her request. However, its failure to do so was not harmful error. TEX.R.APP.P. 81(b)(1). Although submitted in granulated form, the jury questions contained the proper elements of a premises liability action. Because the charge fairly submitted to the jury the disputed issues of fact and because the charge incorporated a correct legal standard for the jury to apply, we hold that the trial court's refusal to submit Warner's tendered question and instructions did not amount to harmful error.

We find that the trial court did not abuse its discretion is submitting jury question one and it did not amount to harmful error.

### Conflicting Jury Findings

■ First, we note that Dr. Isern did not object to receipt of the verdict or make any objection at the time that any of the jury's findings were in conflict before discharge of the jury, thereby "waiving" any alleged error as to any conflict in the jury findings. *See Ciba–Geigy Corp. v. Stephens*, 871 S.W.2d 317, 324 (Tex.App.—Eastland 1994, writ denied); *Durkay v. Madco Oil Co.*, 862 S.W.2d 14, 23 (Tex.App.—Corpus Christi 1993, writ denied); *Greater Houston Transp. Co. v. Zrubeck*, 850 S.W.2d 579, 586 (Tex.App.—Corpus Christi 1993, writ denied); *Roling v. Alamo Group (USA), Inc.*, 840 S.W.2d 107, 109 (Tex.App.—Eastland 1992, writ denied).

In any event, no conflict can exist between affirmative and negative answers concerning two different claims of negligence. *See Robertson Transport Co. v. Hunt*, 345 S.W.2d 293, 296 (Tex.Civ.App.—San Antonio 1961, no writ). A "No" answer to a special issue simply means that a party having the burden of proof failed to convince the jury as to such liability issue. *Herbert v. Herbert*, 774 S.W.2d 1 (Tex.App.—Fort Worth 1988, writ denied).

In order for conflicting findings to destroy each other, one finding must be such as would warrant a judgment for one of the parties, and the other finding would warrant a judgment for the other party. *Grice v. Hennessy*, 327 S.W.2d 629, 633 (Tex.Civ.App.—San Antonio 1959, no writ); *Woodard v. Tatum*, 277 S.W.2d 943, 945 (Tex.Civ.App.—Waco 1955, no writ). In addition, the existence of a claimed irreconcilable conflict between certain findings becomes immaterial if there "remains at least one finding supporting the judgment which is not in conflict with any other," *Gilcrease v. Hartford Acc. & Indem. Co.*, 252 S.W.2d 715 (Tex.Civ.App.—El Paso 1952, no writ).

Also, to present a conflict the jury findings must concern the "same subject matter." *Phipps v. City of Waco*, 551 S.W.2d 140 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.); *Turner v. Victoria County Elec. Co-op. Co.*, 428 S.W.2d 484 (Tex.Civ.App.—Waco 1968, no writ). When testing an alleged conflict, specific findings control over general or ambiguous findings and if a conflict is apparent, the court will disregard general or ambiguous findings to resolve it. *Winn v. Ridgewood Dev. Co.*, 691 S.W.2d 832 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

Any apparent conflict in a jury's verdict should be reconciled if it can be done reasonably in light of the pleadings, the evidence,

the answers to other issues and the verdict as a whole. In making such determination, the court must consider the entire charge and all of the verdict. *Cox v. Huffman,* 159 Tex. 298, 319 S.W.2d 295 (1958); *Little Rock Furniture Mfg. Co. v. Dunn,* 148 Tex. 197, 222 S.W.2d 985 (1949).

▮ With the foregoing in mind, Dr. Isern first complains about the partial verdict. He asserts the jury's affirmative finding to Question 1(6)(a) that Dr. Isern failed to exercise ordinary care in failing to admit Mrs. Watson to the hospital for further diagnosis, tests, or medical evaluation conflicts with the jury's failure to reach a verdict to Question 1(5)(a) as to whether Dr. Isern was negligent in failing to perform the necessary physical examination of Mrs. Watson's right leg to diagnose or evaluate the nature and extent of possible vascular injuries or damages to ligaments of the knee. Doctor Isern asserts a second conflict between Question 1(3) and 1(5), claiming that the failure of the jury to answer question 1(5) conflicts with the jury's affirmative answer under question 1(3) that he was negligent in failing to use a Doppler instrument to "diagnose or evaluate the vascular system of Mrs. Watson's injured right leg." We hold that an affirmative finding which will sustain a judgment can never conflict with an "unanswered" question. *See Stalder v. Bowen,* 373 S.W.2d 824 (Tex.Civ. App.—Dallas 1963, writ ref'd n.r.e.).

▮ Doctor Isern next argues a conflict between a negative finding and an affirmative finding. He asserts a conflict between the negative finding of Question 1(4), regarding negligence in failure to obtain an arteriogram, and the affirmative finding of Question 1(6), that Dr. Isern was negligent in failing to hospitalize Mrs. Watson for "further diagnosis, tests or medical evaluation in view of the possible injuries she may have suffered ... as a result of the fall on May 1, 1982." However, it is clear that the two questioned findings do not involve the same subject matter—but rather two different negligence claims, i.e., one asking about the failure to obtain an "immediate arteriogram" and the other as to whether appellant was negligent in failing to hospitalize Mrs. Watson for further diagnosis, tests or medical evaluation.

▮ The next alleged conflict is asserted on the basis that the failure to hospitalize affirmative finding to Question 1(6) conflicts with the jury's refusal to find in Question 1(1) that Dr. Isern was negligent in failing to have Mrs. Watson's injury evaluated by cardiovascular specialists. We find the findings are not in conflict. *See Robertson,* 345 S.W.2d at 296; *Herbert,* 774 S.W.2d at 3. For the reasons stated, appellant's first point of error is denied.

Appellant's second point of error argues the negligence/proximate cause liability findings against Dr. Isern on the basis of no evidence and insufficient evidence that Dr. Isern was negligent (1) in failing to hospitalize Mrs. Watson or (2) in not performing a Doppler exam under the circumstances to ensure that Mrs. Watson did not have a ruptured popliteal artery.

*Evidence Standards Review*

When addressing a no evidence point, we must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990); *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 593 (Tex.1986); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985); *White v. Sullins,* 917 S.W.2d 158 (Tex.App.—Beaumont 1996, writ denied). Where there is no evidence to support the jury's verdict, and the appellant has filed a motion for judgment n.o.v. as here, the case must be reversed and rendered, and the plaintiff takes nothing. *Id.* When reviewing an insufficient evidence point, however, we consider and weigh all the evidence; and we set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). If we sustain a factual insufficiency point, we must "clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996), quoting *Pool v. Ford Motor Co.,* 715 S.W.2d 629,

635 (Tex.1986). If we find factually insufficient evidence to support a jury's verdict, we must remand for a new trial. *Id.*

### Law of the Case

■ This Court held in *Watson,* 782 S.W.2d at 553–555, that the evidence of Dr. Ivey and Dr. Wolma, the same evidence offered on retrial, raised a fact issue as to Dr. Isern's negligence in failing to use the doppler instrument, and in failing to hospitalize Mrs. Watson for further observation and further testing; and, that the failure to submit the above two issues was error, and required reversal. Such holdings constitute the "law of the case" to be applied on appeal following a second trial. The law of the case doctrine applies where the appellate court holds that there was evidence raising a fact issue for the jury, and in a second trial the jury returned a verdict for the plaintiffs on almost identical evidence. *Lincoln National Life Insurance Co. v. Roosth,* 306 F.2d 110 (5th Cir.1962), *cert. denied,* 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963); *Consolidated Casualty Ins. v. Smith,* 309 S.W.2d 80 (Tex.Civ. App.—Houston 1958, writ ref'd n.r.e.); *Bingham v. Kimbrell,* 285 S.W.2d 312 (Tex.Civ. App.—Austin 1955, writ ref'd n.r.e.).

We deny appellant's second point of error based upon the "law of the case doctrine". However, in the interest of justice we will address the conflicting evidence presented by both sides at retrial.

### Competence of Medical Expert Testimony

It is well-established that the plaintiff must offer medical expert testimony to prove a medical malpractice case against a physician because Texas law considers medical negligence cases to involve scientific, technical, specialized and complicated knowledge, skills and standards that are difficult or impossible for a jury to evaluate without the guidance of medical expert testimony. *See Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977); *Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965).

In 1987, the Texas Supreme Court abandoned the prior "ultimate issue rule" which prevented experts in Texas cases from expressing an opinion on mixed law-fact issues prior to the adoption of Tex.R.Civ.Evid. 704. *See* Danell L. Keith, *Medical Expert Testimony in Texas Medical Malpractice Cases,* 43 Baylor L.Rev. 1,17 (1991). In other words, experts, may now testify as to whether a defendant's conduct constituted "negligence," "gross negligence," "proximate cause," or the like. *See Louder v. DeLeon,* 754 S.W.2d 148–49 (Tex.1988); *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 365 (Tex.1987). *See also* Tex.R.Civ.Evid. 704.

However, this new era of freedom allowing experts to testify on the ultimate issue is not without bounds. The Supreme Court has said that:

> Fairness and efficiency dictate that an expert may state an opinion on a mixed question of law and fact *as long as the opinion is confined to the relevant issues and is based on proper legal concepts.*

*Louder,* 754 S.W.2d at 148–49, quoting *Birchfield,* 747 S.W.2d at 365 (emphasis supplied).

Accordingly, before a testifying expert's opinion can be rendered, a predicate must be laid showing that the expert is familiar with the proper legal definition in question. *E–Z Mart Stores, Inc. v. Terry,* 794 S.W.2d 63, 65 (Tex.App.—Texarkana 1990, writ denied).

■ With the foregoing in mind, appellant first argues that only Dr. Davies and Dr. Sibley testified to "the ultimate issue, i.e.", that Dr. Isern was "negligent and/or grossly negligent", and because such testimony by both witnesses was not based on proper legal concept in that neither was given a proper legal definition of the "terms", and, there is no evidence that either was knowledgeable about such legal terms, there is no competent expert medical evidence to support the jury findings against Dr. Isern of negligence or proximate cause.

■ We reject appellant's argument for two reasons. First, our review of the record reflects that while Dr. Sibley did testify as to negligence he was provided with a proper legal definition of that term and appellant's

lack of legal concepts[3] argument so far as Dr. Sibley is concerned is without merit. Second, the "ultimate issue rule" is permissive and not mandatory and we find no authority to the contrary. We hold medical expert evidence that is based on reasonable medical probability, other than, "the ultimate issue" evidence, will support a jury finding.

### "Doppler"[4] Liability Evidence

■ Doctor Isern testified that he performed a thorough physical exam, and that he felt Mrs. Watson's pulses in the foot. He further testified where the foot pulses are felt, a "Doppler" exam is not necessary.

Doctor George Sibley testified that a "Doppler exam" was mandatory in Mrs. Watson's case because of her weight and because it was an easy test to do.

Doctor Sibley stated he was an Orthopedic Surgeon in 1986. He further testified that a total transection or disruption of the popliteal artery is unusual; that there are tests like a "Doppler" or an arteriogram, but that a physical examination should be sufficient; that you might check a pulse in the ankle if you have a question about circulation as to whether the pulse is present or faint. Doctor Sibley opined that an absent pulse is the sort of finding that would lead a doctor to use a "Doppler."

Doctor Fred Wolma, a teaching Galveston Cardiovascular Surgeon, opined that at the time of her injury [fall] Mrs. Watson most likely sustained an injury to the popliteal artery; that at the time of Mrs. Watson's surgery it appeared her artery had been totally "torn apart, disruptured, transacted"; and, that with that type of damage one would not be able to feel a pulse in her foot.

Doctor Al Davies, an Associate Professor at Baylor Medical School, admitted that there would have been no need for a "Doppler" exam if the patient's distal pulses were good; that a "Doppler" exam is only used if there is some question as to the patient's pulses; and, that failure to do one of two things would fall below the standard of care of the profession, either to examine Mrs. Watson's other leg or perform a Doppler, not both.

Doctor Martin Ivey, a treating Orthopedic Surgeon at John Sealy Hospital, when asked if a Doppler instrument would be "a better thing to utilize to test the sufficiency of a popliteal artery than merely feeling it with your hand", answered, "Well, I've always had difficulty, personally, feeling a popliteal artery directly in the back of the knee because of the other structures and fatty tissue. I think a Doppler is helpful in some cases to detect pulses in the foot area."

Lastly, Dr. Bessell testified that a Doppler is not a more reliable tool if a pulse in the foot is palpable; that a Doppler is only more reliable if the pulse is not palpable; and that a physician might now use a Doppler for injuries, but back in 1982 in all reasonable medical probability a physician would not have. Dr. Bessell further testified that in all reasonable medical probability, if Mrs. Watson's popliteal artery had been ruptured, Dr. Isern would not have been able to feel the pedal pulse.

### Evidence of Failure to Hospitalize

Mrs. Watson testified that Dr. Isern did not tell her of the possibility of damage to the blood vessels, which might require the leg to be amputated if surgery was not done; that a Doppler exam was available to test the blood supply to her leg; that an arteriogram may be necessary; or tell her of any other risk which would directly or by inference advise her she stood a risk of amputation of her leg if her injury was not properly diagnosed and treated.

Dr. Isern testified that based upon the history of the patient's fall that he did consider "she could have disrupted the ligaments of the knee or that she could have suffered a rupture or damage to the popliteal artery or

---

3. Appellant's brief mentions that Dr. Sibley was allowed to testify that "Dr. Isern was guilty of malpractice" over his "inflammatory testimony" objection. No admission of evidence point of error or argument is made. Accordingly, we do not address that issue.

4. A "Doppler" is an instrument used to amplify pulse signals within a blood vessel.

an artery or vein in the leg or any nerve in the leg." Based upon the findings of a ruptured popliteal artery and disruption of the cruciate and lateral ligaments in the surgery at Galveston, Dr. Isern admitted the facts reveal that when he saw her she had the "ultimate risk of losing her leg." Doctor Isern also admitted, based upon the assumption that the injury to Mrs. Watson's popliteal artery occurred at about 11:00 p.m. Saturday, that when he discharged her from the emergency room at approximately 2:00 a.m. Sunday, three hours of the "golden time" to repair the damage has already passed, which involved a loss of one-half of the "ideal six-hour" safety zone necessary to save the leg from amputation. Based upon a hypothetical "assumption" of facts favorable to Mrs. Watson's version of her injury and medical evaluation, Dr. Isern admits he would not have discharged her from the hospital based upon such facts or circumstances, and that he would have been alerted to the possibility of a ruptured popliteal artery. He also admits he knew that the overall statistical literature reflects that 21 to 25% of dislocation of the knee injuries will cause a rupture of the artery and that, using the patient's history of dislocation of her knee, coolness of the leg, and feeling of ants crawling on the leg, the symptoms are those of "probably a popliteal artery rupture."

Doctor Sibley testified that the "golden time" to repair a ruptured popliteal artery in order to prevent a loss of the leg is probably six hours and that "Beyond that time the chance of saving the leg is fairly remote; and if you get ten hours ... in an adult I don't think you can save a usable leg." Dr. Sibley testified that discharging the patient with the advice to go home and put an ice pack on the knee, stay off her feet and elevate the leg on a pillow, and to take Tylenol for pain is not appropriate treatment and involved an entire want of care for the patient. Doctor Sibley further testified it was negligence for Dr. Isern to discharge Mrs. Watson to go home with the statement that she was to stay off her foot, put ice packs on the leg, and to take Tylenol; and, based upon the legal definitions of negligence and proximate cause, Dr. Isern's malpractice was a proximate cause of the amputation of Mrs. Watson's leg.

Doctor Ivey testified that the "time frame" of 6 to 8 hours is "usually held as a standard" for repair of a popliteal artery in order to have a possibility of salvaging the leg; that the probability of amputation is caused by delay in repair of the popliteal artery within the 6–8 hour time frame after a traumatic injury because of "damage to the muscles and nerves, loss of their blood supply, and death of those structures"; that based upon a hypothetical question, the damage found at surgery was, with a reasonable medical probability, related to the fall described by Mrs. Watson on the Saturday night before she was seen by Dr. Isern; that there was a reasonable medical possibility that her leg could have been saved if she had undergone surgery within 6 hours after her injury; and, sending a patient home based upon such a history and findings would not be proper medical practice.

Dr. Wolma testified that based upon the condition of the leg at surgery, "there's no question that four to six hours would be essential to reestablish the circulation to that limb in order to save it"; that with a loss of blood supply, there is marked damage to the nerves and muscles that is irreparable, and based upon the history and examination that the injury described by Mrs. Watson is the "most likely time" of the rupture of the artery; and that based upon a reasonable medical probability, her leg would probably have been saved if surgery had been performed within six hours following her fall. Based upon a hypothetical question, Dr. Wolma testified that immediate hospitalization and immediate surgery is the proper treatment for a ruptured popliteal artery, and that a patient should be advised of these facts.

Doctor Bessell opined that Mrs. Watson had suffered a "severe injury"; that if Mrs. Watson's vascular injury had been timely diagnosed, in all probability if the surgery had been done within 6–8 hours time the leg could have been saved; and, that based upon the signs and symptoms reflected by the testimony of Mrs. Watson and the ER records, the emergency room standard of care required the patient to be admitted to the hospital and further watched and evaluated.

As reflected by the record, each side vigorously presented evidence in support of their respective positions and at the time the evidence was conflicting, which is within the province of the fact finder to resolve. After reviewing the entire record, we find that there is some evidence and sufficient evidence to support the jury finding regarding negligence by failure to use a "Doppler" and failure to hospitalize. Accordingly, we will not substitute our judgment for that of the jury. Appellant's second point of error is denied.

Appellant's third point of error makes a no evidence attack on the jury's award of (1) $200,000.00 for future pain and suffering and (2) $5,500.00 for future medical.

### Future Medical

A jury may award future medical expenses based on the nature of the injuries, medical care rendered prior to trial, and plaintiff's condition at trial. *Harvey v. Culpepper*, 801 S.W.2d 596 (Tex.App.—Corpus Christi 1990, no writ); *North Houston Pole Line Corp. v. McAllister*, 667 S.W.2d 829 (Tex.App.—Houston [14th Dist.] 1983, no writ).

Our record reflects expert testimony that Mrs. Watson will be confined to a wheelchair for life, that she will be deprived of normal exercise and activities which could cause future problems, and she will require "future follow-up." Although Mrs. Watson testified that she was not currently receiving any medical treatment for her leg amputation, she has had various medical treatments and problems since her injury and being confined to a wheelchair has its risks for future injury.

We find there is some evidence to support the jury's award of $5,500.00 in future medical.

### Future Pain and Mental Anguish

Appellant's third point of error also attacks the jury's award of $200,000 to Mrs. Watson on the complaint that there is no evidence that Mrs. Watson would, in reasonable medical probability, suffer any future physical pain or mental anguish as a result of the loss of her leg.

In addressing future damages, the law entrusts to the jury's good sense what future damages would be fair and reasonable. There is no need for expert speculation because doctors do not have a crystal ball to guide them in deciding future pain and mental anguish.

Mrs. Watson was 56 years old at time of trial, and she testified that prior to her injury that she had been a "happy person" and content, with no problems with her life or family; she was able to work and do the things she wanted to do; she still has the feeling that her leg is still there, although she tries to ignore it, and has the mental awareness of "feeling of pain and discomfort in her leg"; that she continues to suffer quite a bit, and mentally she suffers because she cannot do the things for her grandchildren she should be able to do; that she cannot go places without being pushed in her wheelchair, and has problems getting in and out of a car, which she says, "it's just a misery to me"; that she experiences severe pain or discomfort from the leg that was amputated as an everyday thing; and, that she has mental anguish about dying and having to go before God without a leg, because everything in Heaven is perfect: "So, me with one leg and I would have to face God like this, that's hard on me."

Mr. Watson testified that his wife has been affected pretty badly by the loss of her leg; that it "hurts her to her heart" that she cannot do things she wants to do, including being with her grandchildren; and, that she sometimes says that she is "happy but just don't feel right," and that she is "just not like other persons with a leg." They had a normal sexual life before she lost her leg, but now they do not, and it bothers his wife; and, the loss of her leg has effected her mentally and she is "depressed" and seems "anxious and worried about her problems and the loss of her leg."

The undisputed facts are that Mrs. Watson's life has been totally altered by the amputation of her leg, and she is confined for her remaining lifetime to a wheelchair.

Life expectancy is entrusted to the "common sense of a jury," and in this case it is

reasonable that Mrs. Watson may live at least another 20 years. Using 20 years as her life expectancy, the jury allocated $10,000 a year for physical pain and mental anguish.

### The Above Evidence

We find there is some evidence to defeat appellant's "no evidence" attack on the jury's award of $200,000.00 for future physical pain and future mental anguish.

 It must also be kept in mind that the award was for both future physical pain and future mental anguish. The pure mental anguish associated with the loss of her leg will support a $200,000.00 award. *See Pipgras v. Hart*, 832 S.W.2d 360 (Tex.App.—Fort Worth 1992, writ denied); *Pentes Design, Inc. v. Perez*, 840 S.W.2d 75 (Tex.App.—Corpus Christi 1992, writ denied); *Hicks v. Ricardo*, 834 S.W.2d 587 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Gulf States Utilities Co. v. Dryden*, 735 S.W.2d 263 (Tex. App.—Beaumont 1987, no writ). Appellant's third point of error is denied.

Appellant's fourth point of error claims the trial court erred in allowing (1) impermissible elements of damages in the charge and judgment and (2) triple recovery for Rix Watson.

 In Question 5 the jury awarded Mr. Watson $3,000 for each of the following three (3) separate elements of damages, a total of $9,000 for past and future losses: (1) loss of services of his wife as a housewife; (2) loss of marital rights; and (3) loss of society and companionship.

Appellant's trial objection: to Question 5(1) was that Mr. Watson was entitled to "loss of household services," but not "loss of services," and that there was no definition of loss of services; to Question 5(2) that Mr. Watson is not entitled to "loss of marital rights," but only for "loss of consortium" and that the question permits the jury to speculate as to what damages are to be awarded; and to Question 5(3) that there was no definition of the term "loss of society and companionship" and it would allow the jury to speculate upon an improper element of damage.

Appellant's fourth point of error claims that Question 5(1) through (3) damages are impermissible because such elements of damages "do not exist under Texas Law." Appellant admits that the husband is entitled to recover for loss of material rights or "consortium," *see Whittlesey v. Miller*, 572 S.W.2d 665 (Tex.1978); and is silent as to any authority regarding "loss of society and companionship."

Without citing any authority, appellant also argues that all three damage elements are all one and the same recoverable loss, i.e., loss of consortium, thus Mr. Watson was allowed a "triple recovery." We also find no authority to support appellant's argument and thus reject same by concluding that the trial court did not err in rendering judgment for the damages to Mr. Watson. Appellant's fourth point of error is denied.

### Jury Argument

 Appellant's fifth point of error complains of the trial court's refusal to grant a mistrial based on a claimed incurable jury argument which injected insurance into the case.

During closing arguments, appellant's counsel addressed the jury as follows:

Now, she didn't walk in there with a little sign board hanging around her neck, 'I tripped and I have a ruptured popliteal artery.' She didn't know anything about popliteal arteries. He did. She didn't have the sign around her neck, but he had the knowledge to put it there. He could have hung a sign around her neck and said, 'Take this lady in a wheelchair right now and do an arteriogram. Before I let her go, I want to make sure that she doesn't lose her leg because we have already lost three hours.' *Did you ever think about insurance? We all buy insurance to protect our homes and our property.* You've heard the term since you were a little kid, 'to insure.' (sic ensure) *One of the other words used is 'to assure,'* assure that something won't happen. Don't you think that this man owed her that obligation? She walked out of there, she was going to lose her leg. She was going to lose her leg, and all he had to do was do a Doppler exam. It would have taken him,

what, ten minutes at the most ... [emphasis added]

We first reject appellees' argument that in the context of the jury argument made the use of the word "insurance' is solely synonymous with "ensure" and "assure", i.e., that Dr. Isern could have assured that Mrs. Watson would not suffer an amputation by his doing a simple, non-evasive "Doppler" exam. Rather we would characterize the use of the term "insurance" at most as a casual or inadvertent reference to insurance coverage and at least as having different connotations.

We also reject appellant's argument that the injection of insurance in a personal injury trial is always reversible error. The "presumed harmful error" no longer exists under Texas law, being replaced by the "harmless error" rule which requires the complaining party to show the error caused an improper verdict. TEX.R.APP.P. 81(b)(1).

■ Appellant did move for a mistrial after closing of the jury argument based upon a claim that plaintiff "injected insurance into the case intentionally." However, appellant "waived" any error of objectionable argument by failing to timely object and requesting an instruction that the jury disregard the argument. *Ramirez v. Acker,* 134 Tex. 647, 138 S.W.2d 1054 (1940); *Jenkins v. Chapman,* 636 S.W.2d 238 (Tex.App.—Texarkana 1982, writ dism'd); *Travis v. Vandergriff,* 384 S.W.2d 936 (Tex.Civ.App.—Waco 1964, writ ref'd n.r.e.); *Maxwell v. Maxwell,* 204 S.W.2d 32 (Tex.Civ.App.—Amarillo 1947, writ ref'd n.r.e.); *Shaw v. Porter,* 190 S.W.2d 396 (Tex.Civ.App.—Fort Worth 1945, writ ref'd w.m.). An objection is required because the opposing party has the "right to know" of any claimed error so that he can explain or withdraw it. In fact, upon insisting that the mere word insurance was prejudicial, the trial court could have cured any error by an instruction that insurance had nothing to do with the case to be decided and was to be disregarded. *See Patranella v. Scott,* 370 S.W.2d 922 (Tex.Civ.App.—Waco 1963, no writ).

Instances in which jury argument results in incurable harm are rare. *Strahan v. Davis,* 872 S.W.2d 828, 836 (Tex.App.—Waco 1994, writ denied). Not every casual mention of the word 'insure' requires either a mistrial or new trial. *Id; Dennis v. Hulse,* 362 S.W.2d 308 (Tex.1962); *Trice Contract Carpets & Furniture Co. v. Gilson,* 329 S.W.2d 476, 483 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.).

■ To establish reversible error in jury argument, appellant must prove (1) the argument was not invited or provoked, (2) was preserved by proper trial predicate such as an objection, motion to instruct, or motion for mistrial, (3) that the error was not curable by instruction, prompt withdrawal of the statement, or reprimand from the court, and (4) that the argument constituted "reversible harmful error." *Wells v. HCA Health Services of Texas, Inc.,* 806 S.W.2d 850, 854 (Tex.App.—Fort Worth 1990, writ denied).

■ *Haryanto v. Saeed,* 860 S.W.2d 913 (Tex.App.—Houston [14th Dist.] 1993, writ denied), holds that where the complaining party complains of incurable harm he must show that the alleged improper argument causing harm was greater than the "probability that the verdict was based upon proper proceedings and evidence." In making that determination, an appellate court must examine the argument in light of the whole case, beginning with voir dire and ending with closing argument. The court must look at the length of the argument, whether it was repeated or abandoned; whether there was cumulative error, and the probable effect of the argument on a material finding. *Id.* at 919.

■ Moreover, it is essential that the complaining party establish that the mere injection of the word "insurance" actually caused an improper verdict. *Tripp v. Bloodworth,* 374 S.W.2d ·713, 717 (Tex.Civ. App.—Eastland 1964, writ ref'd n.r.e.).

In the absence of a clear showing that any reference to insurance resulted in any harm or prejudice, refusal to declare a mistrial is not error. *Red Ball Motor Freight, Inc. v. Cordova,* 332 S.W.2d 753 (Tex.Civ.App.—Beaumont 1960, writ ref'd n.r.e.); *Southwestern Freight Lines v. McConnell,* 269 S.W.2d 427, 430–31 (Tex.Civ.App.—El Paso 1954, writ ref'd n.r.e.). Mere mention of insurance

before a jury does not result in an automatic mistrial or reversal. The complaining party has an obligation to prove that it was prejudicial and reasonably calculated to create an improper verdict. TEX.R.CIV. EVID. 411; *Beall v. Ditmore,* 867 S.W.2d 791 (Tex. App.—El Paso 1993, writ denied).

In summary, we find the questioned jury argument was at most only a casual and incidental reference to insurance which while we do not condone, does not rise to the level of error; that in any event, error, if any, could have been corrected and was waived by appellant's failure to object and request an instruction to disregard; and in the light of the whole case we cannot say that such jury argument error amounted to such a denial of rights of appellant as was reasonably calculated to cause and primarily did cause rendition of an improper judgment in this case, TEX.R.APP.P. 81(b)(1). For the reasons stated, appellant's fifth point of error is rejected.

*Prejudgment Interest on Future Damages*

Appellant's sixth point of error contends the trial court erred in awarding prejudgment interest on the future damages awarded the Watsons.

▆ Appellant argues that *Cavnar v. Quality Control Parking,* 696 S.W.2d 549 (Tex.1985), controls the prejudgment interest award in this case because the suit filed in September 1983, asserts an injury in 1982, a time prior to the Tort Reform Act which added section 6 to article 5069–1.05 to require prejudgment interest on future damages.[5] However, article 5069–1.05 applies to actions commenced after September 1, 1987, or *"to new trials or retrials following an appeal in the action commenced before the effective date." Id.; Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 768 (Tex. 1995). This case is such a retrial following such an appeal.

▆ Appellant also argues that because Mr. Watson's past and future damages were not segregated, he is not entitled to prejudgment interest. However, since enactment of the prejudgment interest statute, there exists no necessity to segregate past and future

damages. *Missouri Pacific R. Co. v. Lemon,* 861 S.W.2d 501 (Tex.App.—Houston [14th Dist.] 1993, writ dism'd by agr.) as suggested by appellant does not control this case. *Wal–Mart Stores, Inc. v. Berry,* 833 S.W.2d 587, 597 (Tex.App.—Texarkana 1992, writ denied), held that the "clear language of the statute mandates awarding prejudgment interest to the full amount of judgments, whether or not damages are segregated." The court cites *C.T.W. v. B.C.G.,* 809 S.W.2d 788, 795 (Tex.App.—Beaumont 1991, no writ), for its statement that our courts recognize that the statute makes no distinction between past and future damages, and that presumptively, the Legislature was aware of *Cavnar* when it enacted the new statute.

In *C & H Nationwide v. Thompson,* 903 S.W.2d 315 (Tex.1994), the Supreme Court specifically held that the Legislature did not intend to segregate past and future damages in the award of prejudgment interest, and held that the statute modified *Cavnar* as to allow prejudgment interest on future damages.

▆ Lastly, appellant incorrectly asserts that *Nationwide* holds that prejudgment interest in tort cases violates a defendant's Constitutional "due process" of law safeguards. To the contrary, the opinion holds that prejudgment interest does not violate a defendant's due process of law safeguards since it meets the "rational relative test."

Appellant's sixth point of error is overruled.

*Cumulative Error*

Failing to have found reversible error in appellant's points of error one through six, we reject appellant's "cumulative error" argument in his seventh point of error.

*Remittitur for Excessive Damages*

▆ Appellant's final point of error argues that the jury award to Mrs. Watson for the loss of her limb is excessive because when pre-judgment interest is added, a judgment in excess of $3.1 million in this case "shocks the conscience." Appellant cites no

---

5. Tex.Rev.Civ.Stat.Ann. ART. 5069–1.05, § 6 (VER- NON SUPP.1997).

authority and we know of none which supports such an argument for a remittitur based upon "prejudgment interest"[6], which is allowed by statute.

An "abuse of discretion" test covers remittitur. *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768 (Tex.App.—Houston [1st Dist.] 1987, writ ref. n.r.e.), *certiorari dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). TEX.R.APP.P. 85 does provide for a suggested "remittitur" by the Court of Appeals. However, we should not disturb the jury's award of damages "unless it is irrational or so excessive as to shock the conscience of the court." *Clark v. Smith,* 494 S.W.2d 192, 198 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.).

Based upon Mrs. Watson's permanent injuries there is nothing to suggest a "runaway jury" or that the damages award was due to passion, prejudice, bias or improper jury deliberations. Where the record does not show the jury was influenced by passion and prejudice in awarding damages, the Court is without power to require a remittitur. *Bluebonnet Exp., Inc. v. Foreman,* 431 S.W.2d 45 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ); *Pioneer Bus Co. v. Ward,* 422 S.W.2d 550 (Tex.Civ.App.—Houston [14th Dist.] 1967, no writ); *Texarkana Bus Co. v. Carter,* 301 S.W.2d 300 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.).

Appellant's eighth point of error remittitur argument is rejected.

### Appellees' Cross Appeal

In Question 2(3)(a)(b) the jury found that Mrs. Watson was negligent in "failing to return to the emergency room at Baptist Hospital or to contact a physician before May 4, 1982, when she saw Dr. Bessell" and that such negligence was proximate cause of injury.[7] The jury answered the apportionment portion of Question 3 by finding Mrs. Watson's negligence was 35% in causing the amputation of her right leg and that Dr. Isern's negligence was 65% of the cause.

The trial court denied the Watson's motion to disregard the contributory findings and reduced the total damages of $1,432,600 awarded to Mrs. Watson and $9,000 awarded to Mr. Watson by 35% in entering judgment against Dr. Isern. The court denied the Watson's motion for new trial asserting she should be awarded full damages based upon no evidence, legally insufficient evidence, judicial admission of defendant, and great weight points.

In five cross-points of error, appellees contend that the trial court erred in submitting contributory negligence issues to the jury; in refusing to disregard the jury's contributory negligence findings; and, in disregarding the judgment damage award of 35% because such actions by the trial court are contrary to the judicial admissions of Dr. Isern, unsupported by legally sufficient evidence, and are so contrary to the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

### Judicial Admission

■ Formal declarations in open court by a party's attorney constitute judicial admissions, and include facts asserted by pleading. *Rosse v. Northern Pump Co.,* 353 S.W.2d 287 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.). Therefore, where submission of an issue is not supported by evidence or is contrary to judicial admissions in trial of the case, the jury's findings on such issues are not binding on either the trial court or appellate court. *Thweatt v. Ocean Acc. & Guarantee Corp.,* 62 S.W.2d 250 (Tex.Civ.App.—El Paso 1933, writ ref'd). The effect of a judicial admission is to waive proof of matters admitted in favor of an opposing party, and the admitting party is bound by the admission. *Turner v. State,* 850 S.W.2d 210, 213 (Tex.App.—Texarkana 1993); *Markwardt v. Harrell,* 430 S.W.2d 1 (Tex.Civ.App.—Eastland 1968, writ ref'd n.r.e.); *Jones v. Underwood & Weld*

---

6. We note " prejudgment interest" in this case covers fifteen (15) years since date of injury.

7. The jury refused to find under Questions 2(1) and 2(2) that Mrs. Watson was negligent in failing to give an accurate statement as to how she was injured or in failing to accurately state what her complaints or symptoms were at the time of her fall or when seen in the Baptist Hospital, and refused to find proximate cause.

*Co., Inc.,* 406 S.W.2d 491 (Tex.Civ.App.—Beaumont 1966, no writ).

During closing jury argument, defense counsel addressed the jury as follows:

MR. WHITTENBURG: I'm not going to talk to you about No. 2. I—you haven't heard me claim anything about Mrs. Watson being negligent during this trial or offer any evidence on that. That's up to you to—

MR. HOLLOWAY: Your Honor, if that's true, then I ask that that issue be withdrawn from the Court's charge if he's not making that claim. He has pled it, and he has claimed it.

MR. WHITTENBURG: I have not claimed it, your Honor. It's raised by the evidence, but I haven't claimed that.

THE COURT: All right. That's denied.

The Watson's argue the trial court should have disregarded the jury's contributory negligence and apportionment findings because defense counsel's declaration amounted to a judicial admission regarding these issues. We find that the questioned jury argument does not rise to the level of a judicial admission.

### *Contributory Negligence*

 Because Mrs. Watson is an "ordinary person," her conduct may be evaluated by the jury without the need for medical or expert testimony. She is held to the standard of ordinary care, i.e., that care of a person of reasonable prudence under the same or similar circumstances. *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex. 1984); *Great Atlantic & Pacific Tea Co. v. Evans,* 142 Tex. 1, 175 S.W.2d 249, 250–51 (1943). The trier of fact may take into consideration the "common experience of mankind," to determine the care and diligence an ordinary prudent person would use to prevent injuries under the circumstances. *Id.* at 251, 175 S.W.2d 249. The testimony of the Watson experts that she was not contributorily negligent is merely some evidence that she was not negligent, and the jury was not bound by that testimony.

In addition, each side vigorously presented evidence in support of the proposition that she was or was not herself negligent. The record reflects a number of instances of conflicting testimony which required resolution of credibility issues. These are decisions within the province of the fact finder.

After reviewing the entire record, we find that there is some evidence to support the finding of contributory negligence. Accordingly, we will not substitute our judgment for that of the jury. Appellees' cross-points are denied.

Judgment is AFFIRMED.