Reversed and Remanded and Majority and Dissenting Opinions filed June
29, 2004









Reversed and Remanded and
Majority and Dissenting Opinions filed June 29, 2004.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-02-00518-CV

_______________

 

DAVID AND CAROLYN AXELRAD, Appellants

 

V.

 

DR. RICHARD JACKSON, Appellee

________________________________________________________

 

On Appeal from the 334th District Court

Harris County, Texas

Trial Court Cause No. 99-52855

________________________________________________________

 

M A J O R I T
Y   O P I N I O N








In this appeal, we determine whether a patient, in recounting
his or her medical history, may be assessed comparative negligence in a medical
malpractice suit.  We hold that a patient=s name may be submitted in
comparative fault jury questions based on the patient=s response to queries regarding
medical history.  Because there is no
evidence of a query designed to elicit the information that appellant, David
Axelrad, allegedly failed to communicate, no evidence supports appellee, Dr.
Jackson=s contention that David Axelrad had a
duty to volunteer the information. 
Accordingly, it was error to submit David Axelrad=s name in the comparative negligence
jury questions.  We reverse and remand
for a new trial. 

I.  Facts

On Sunday evening, August 17, 1997, David Axelrad, a
psychiatrist, began feeling flu-like symptoms and abdominal pain.  While he drove home that evening, his
abdominal pain increased every time he hit a bump in the road.  Overnight, the pain worsened.  Axelrad felt so ill that he cancelled his
Monday, August 18th psychiatric appointments and called Dr. Richard
Jackson.  Dr. Jackson suggested that
Axelrad might have been suffering from gastroenteritis and recommended
Pepto-Bismol.

By Tuesday morning, August 19th, Axelrad=s pain was worse.  He called Dr. Jackson again and scheduled an
appointment.  Axelrad=s wife drove him to Dr. Jackson=s office.  She drove slowly because her husband=s pain intensified with each bump in
the road.  Upon arrival at Dr. Jackson=s office, she pushed her husband into
the office by wheelchair and, with his help, answered Dr. Jackson=s questions.  Dr. Jackson examined Axelrad and ordered the
following diagnostic tests: (1) ultrasound; (2) blood work; and (3) x-rays of
kidneys, ureter, and bladder.  He did not
take Axelrad=s temperature or perform a rectal
examination.  The Axelrads returned to
their home after the tests.  Around 4:30
p.m., Dr. Jackson called the Axelrads and informed them that the test results
were normal.  Dr. Jackson instructed
Axelrad to take a laxative and perform two enemas.  At that point, Dr. Jackson had not received
all the results of Axelrad=s blood tests. 
Subsequently, those tests revealed an elevated white blood cell count,
indicative of an infection. 








Axelrad took the laxative and attempted to perform the first
enema.  Immediately after administering
the enema, he was nauseous and in severe pain. 
The enema was not productive, and Axelrad fell to the floor
vomiting.  He experienced rigors and
chills.  Frightened, Axelrad=s wife first called Dr. Jackson, who
urged them to administer the second enema. 
She chose not to follow Dr. Jackson=s recommendation.  Instead, she immediately transported her
husband to the emergency room.

In the hospital, tests revealed that Axelrad=s white blood cell count had
increased.  Surgery on Thursday, August
21st, revealed diverticulitis and pus, which had escaped into the abdomen
through a perforation of his colon. 
Axelrad had an eleven centimeter portion of his colon removed, a
temporary colostomy, underwent three surgeries, and suffered a subsequent drug
reaction and infection necessitating intensive care.

Axelrad sued Dr. Jackson for malpractice, contending Dr.
Jackson failed to diagnose the diverticulitis and negligently prescribed
enemas.  The jury assessed fault as
follows: 51% Axelrad C 49% Dr. Jackson.  The
trial court entered judgment in favor of Dr. Jackson because apportionment of
51% fault to Axelrad bars recovery under the comparative negligence statute.

II.  Patient=s Negligence

In his first six issues, Axelrad questions whether a patient
may be assessed comparative negligence in providing a medical history.  Accordingly, Axelrad contends a patient=s duties are limited to certain
circumstances not present in this case.[1]  Axelrad further questions whether there is
evidence that he breached a duty, and whether there is evidence of causation
sufficient to support the jury=s apportionment of fault.








Texas law allows a jury to consider a patient=s comparative fault in a medical
malpractice suit.  See Elbaor v. Smith,
845 S.W.2d 240, 245, 251 (Tex. 1993) (holding it was error to omit patient=s name in comparative fault question
where patient=s refusal to take antibiotics
contributed to infection, which was basis of her medical malpractice claim); see,
e.g., Marvelli v. Alston, 100 S.W.3d 460, 468 (Tex. App.CFort Worth 2003, pet. denied)
(patient was 29% at fault); Sloan v. Molandes, 32 S.W.3d 745, 752 (Tex.
App.CBeaumont 2000, no pet.) (patient was
49% at fault); Isern v. Watson, 942 S.W.2d 186, 200 (Tex. App.CBeaumont 1997, writ denied) (patient
was 35% at fault).  A patient has the
duty to cooperate with a treating physician. 
Elbaor, 845 S.W.2d at 245.[2]

No Texas appellate court has directly addressed whether a
plaintiff=s failure to accurately or completely
relate his or her medical history to the treating physician may constitute
contributory negligence.  But cf. Isern,
942 S.W.2d at 200 n.7 (noting issue, although jury did not find patient
negligent).  However, we have reviewed
authority from other states in order to analyze the issues in this case.  








A patient has no duty to diagnose his or her own condition.  Fall v. White, 449 N.E.2d 628, 634
(Ind. Ct. App. 1983); Mackey v. Greenview Hosp., Inc., 587 S.W.2d 249,
255 (Ky. Ct. App. 1979); O=Neil v. New York, 323 N.Y.S. 56, 61 (N.Y. App. Div.
1971); Lambert v. Shearer, 616 N.E.2d 965, 977 (Ohio Ct. App. 1992); see
Robinson v. Wa. Internal Med. Assocs., P.A., 647 A.2d 1140, 1156 (D.C.
1994) (Mack, J., dissenting); Carreker v. Harper, 396 S.E.2d 587, 589
(Ga. Ct. App. 1990) (Pope, J., dissenting).[3]  








A patient, generally lacking the specialized training of the
doctor from whom he seeks help, has limited capacity to select and communicate
pertinent and relevant aspects of his medical history.  Mackey, 587 S.W.2d at 255; Favalora v. Aetna Cas.
& Sur. Co., 144 So.2d 544, 550 (La. Ct. App. 1962).  A patient may rely upon the doctor to ask
appropriate questions about the patient=s history.  Hawkins v. Greenberg, 283 S.E.2d 301,
307 (Ga. Ct. App. 1981); Fall, 449 N.E.2d at 634; Mackey, 587
S.W.2d at 255; Favalora, 144 So.2d at 550; see Robinson,
647 A.2d at 1150 (Farrell, J., concurring), 1156 (Mack, J., dissenting); O=Neil, 323 N.Y.S.2d at 61 (it is incumbent
upon trained physician to isolate the nature of the patient=s complaints); cf. Pratt v.
Stein, 444 A.2d 674, 694 (Pa. Super. Ct. 1982) (in claim that patient
failed to fully disclose prior treatments for back, it was questionable whether
patient Awas even asked if he had previously
received treatment for his back@).  A patient then has
the duty to respond accurately and to tell the truth.  Rochester v. Katalan, 320 A.2d 704,
709 (Del. 1974) (patient was untruthful about his symptoms in order to receive
methadone); Mackey, 587 S.W.2d at 254; Jensen v. Archbishop Bergan
Mercy Hosp., 459 N.W.2d 178, 184 (Neb. 1990); Brown v. Dibbell, 595
N.W.2d 358, 368B69 (Wis. 1999); see Skar v. Lincoln, 599 F.2d
253, 260 (8th Cir. 1979) (applying Nebraska law where patient gave materially
false information); Johnston v. Ward, 344 S.E.2d 166, 173 (S.C. Ct. App.
1986) (woman who overdosed on prescription drugs and aspirin denied taking
anything but prescription medication); see, e.g., Moodie v. Santoni,
441 A.2d 323, 327 (Md. 1982) (each month, patient indicated no symptoms in
response to specific inquiry, although he was experiencing adverse reactions to
medication that ultimately led to his death); Davila v. Bodelson, 704
P.2d 1119, 1124 (N.M. Ct. App. 1985) (testimony that patient failed to reveal
prior pregnancies when asked).  

A patient has no general duty to volunteer information.  Mackey, 587 S.W.2d at 255; see
Favalora, 144 So. 2d at 550. 
However, courts have sometimes held a patient must volunteer information
Aif the patient is aware that the
treating physician has failed to ascertain some aspect of the patient=s medical history which the patient
knows involves a risk of harm to the patient during the course of future
medical treatment.@  Mackey, 587
S.W.2d at 255; see Haynes v. Hoffman, 296 S.E.2d 216, 217B18 (Ga. Ct. App. 1982); Graham v.
Keuchel, 847 P.2d 342, 358 n.78 (Okla. 1993) (patient knew importance of
her blood type and need for Rho-GAM shot during pregnancy, but failed to reveal
it to her doctor); see, e.g., Jamas v. Krpan, 568 P.2d 1114, 1115B16 (Ariz. Ct. App. 1977) (patient who
knew significance of her history of breast lumps failed to reveal such history
to physician performing breast examination).








Following our survey of authority from other states, we hold
that a patient=s duty to cooperate includes
responding truthfully to a physician=s questions.[4]  A patient has no general duty to
self-diagnose or volunteer information. 
A duty to volunteer information arises only when a patient knows the
significance of unrevealed history and knows the physician has failed to
ascertain the history.[5]


We will determine whether there is legally sufficient
evidence to support Dr. Jackson=s contention that Axelrad breached the duty to exercise
ordinary care in responding or failing to respond to inquiries regarding his
medical history.  Dr. Jackson claims
Axelrad was negligent in failing to reveal (1) that his abdominal pain
originated in the left lower quadrant of his abdomen, and (2) a 1994 medical
examination in which a proctoscopy was conducted because of rectal bleeding and
during which a colonoscopy was recommended to be performed within two years.

A. 
Standard of Review








When a party challenges legal sufficiency of the evidence
supporting an adverse finding relative to an issue on which he does not have
the burden of proof, he must demonstrate on appeal that there is no evidence to
support the adverse finding.  Price
Pfister, Inc. v. Moore & Kimmey, Inc., 48 S.W.3d 341, 347 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied) (citing Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex.
1983)).  We consider all the evidence in
the light most favorable to the jury=s verdict, indulging every reasonable
inference in favor of the prevailing party. 
Id. (citing Associated Indem. Corp. v. CAT Contracting, Inc.,
964 S.W.2d 276, 285B86 (Tex. 1998)).  Only
the evidence and inferences supporting the finding are considered and we must
disregard all evidence and inferences contrary to the jury=s finding.  Lenz v. Lenz, 79 S.W.3d 10, 19 (Tex.
2002).  However, this rule may not be
expanded to sustain a jury verdict supported only by meager circumstantial
evidence from which the jury might Ainfer@ a fact contradicted by direct
evidence.

                                                         B.  Origination of Pain

Dr. Jackson admitted that a patient=s history is a very important tool
for rendering a correct diagnosis. 
Regarding Axelrad=s abdominal pain, Dr. Jackson argues that its genesis is a
crucial aspect of this case.  He contends
Axelrad=s failure to advise him that the pain
originated in the left lower quadrant is contributory negligence.  Thus, we examine the record for evidence that
Axelrad untruthfully reported his symptoms in response to Dr. Jackson=s questions. 

We find no evidence in the record that Dr. Jackson asked a
question calculated to elicit the origin of Axelrad=s pain.  Instead, only a few questions by Dr. Jackson
are delineated in the appellate record. 
For instance, when he spoke to Axelrad via telephone on Monday, August
18th, Dr. Jackson testified that he asked, AWell, tell me exactly what is going
on?@ 
After Axelrad explained that his abdomen was uncomfortable, Dr. Jackson
asked him where his discomfort was, and Axelrad responded that his entire
abdomen hurt.  Although Dr. Jackson
testified, AI asked him some questions about his
discomfort and what was happening,@ the record does not reflect that he
posed a question about the location of Axelrad=s initial pain.  Instead, our review of the record indicates
that Dr. Jackson relied on information volunteered by Axelrad: AI never heard any information about
pain in the left lower quadrant and I never realized that he had that, if he
did.@








On Tuesday, August 19th, Dr. Jackson first communicated with
Axelrad by telephone.  Again, there is no
evidence he asked where Axelrad=s pain originated. 
Rather, Dr. Jackson testified that Axelrad described his current pain Aon both sides of his abdomen.@ 
Dr. Jackson also testified that during the office visit on Tuesday, it
was Mrs. Axelrad who gave the patient history, punctuated with comments from
her husband, who was sitting in a wheel chair. Dr. Jackson again testified that
neither Axelrad nor his wife ever volunteered that the pain began in the left
lower quadrant.  Jackson=s written notes from that office
visit indicate only, Acomplains of abdominal pains for two days, appetite
diminished, complains of vague bilateral abdominal discomfort and supra-pubic
discomfort; no nausea, no abdominal pain except with certain movements; loose
stools for one to two a day.@  Further, during the
office visit, there was no questionnaire submitted to the Axelrads about the
current complaint or about Axelrad=s medical history.[6]  Cf. Moodie, 441 A.2d at 327 (patient
failed to report symptoms on monthly questionnaires about his reactions to a
certain medication). 

Finally, Dr. Jackson spoke with the Axelrads twice on
Tuesday, August 19th, after the office visit. 
In neither instance did he ask about the specific location and genesis
of Axelrad=s pain.[7]
Given the questions posed to him, there is no evidence that Axelrad
inaccurately or untruthfully described his symptoms.  See O=Neil, 323 N.Y.S.2d at 61 (patient was not
negligent in reporting her use of barbiturate, but not her addiction to it,
where physician made no inquiry into dosage or duration of use); see also
Allman, 667 P.2d at 301.








The question remains whether Axelrad had a duty to volunteer
that his pain began in the left lower quadrant when Dr. Jackson did not ask a
question designed to elicit that information. 
In Haynes v. Hoffman, the trial court instructed the jury:  AIf a patient is aware that the
physician is unaware of some aspect of the patient=s medical history which may involve a
risk of harm to the patient, then ordinary care requires that the patient
volunteer this additional information to the treating physician.@ 
296 S.E.2d at 217.  AA patient is contributorily negligent
only if he knows the physician is unaware of a condition which imposes a risk
of danger to the patient and his failure to inform the physician is
unreasonable under the circumstances.@ 
Mackey, 587 S.W.2d at 255. 
Implicit in these cases is the patient=s awareness of the significance of
the unreported history.  See Graham,
847 P.2d at 358 & n.78 (patient knew the importance of her blood type and
receiving Rho-GAM shot during pregnancy, but failed to advise doctors during
her fifth pregnancy).  In this case, we
note Axelrad=s trial testimony that he
revealed to Dr. Jackson left lower quadrant pain, which became diffuse.  However, Axelrad did not testify that he
understood the significance of abdominal pain originating in the left lower
quadrant when he was questioned by Dr. Jackson. 
Dr. Jackson contends Axelrad was negligent in failing to state
specifically that his abdominal pain began in the left lower quadrant.  It is Dr. Jackson=s allegation of negligence that
guides us to search the record for a specific question calculated to elicit a
specific answer.   Notwithstanding our
dissenting colleague=s numerous suggestions of what the jury may Ainfer,@ there is no evidence in this record
supporting the contention that Axelrad knew about the importance of pain
originating in the left lower quadrant of his abdomen when he sought treatment
from Dr. Jackson.

We see no reason to disagree with the majority of
jurisdictions that previously addressed this issue.  Accordingly, Axelrad=s name should not have been submitted
in comparative fault questions based on a failure to advise Dr. Jackson that
his pain originated in the left lower quadrant of his abdomen.








C. 
1994 Medical Examination

The remaining alleged act of comparative negligence is
Axelrad=s failure to report a 1994 medical
examination in which a proctoscopy was performed and a colonoscopy was
recommended to be performed within two years. 
Again, there is no evidence Dr. Jackson asked a question calculated to
elicit this information.[8]  There is similarly no evidence that Axelrad
understood the significance, if any, of this information when he presented to
Dr. Jackson with abdominal pain in 1999.[9]  








One of the elements of a cause of action for negligence is
proximate cause. Accordingly, there must be some evidence or proof of a causal
connection between the alleged contributory negligence and the subject
injury.  Allman v. Holleman, 667
P.2d 296, 300B01 (Kan. 1983) (no connection between
patient=s death and taking birth control
pills); LaCombe v. Dr. Walter Olin Moss Reg=l Hosp., 617 So.2d 612, 615 (La. Ct. App.
1993) (no connection between lower back problems, which patient failed to
reveal, and sciatica suffered during bladder surgery); Lambert, 616
N.E.2d at 977.  A[T]he contributory negligence of the
patient must have been an active and efficient contributing cause of the injury
made the basis of the patient=s claim . . . .@ 
Sendejar v. Alice Physicians & Surgeons Hosp., Inc., 555
S.W.2d 879, 885 (Tex. Civ. App.CTyler 1977, writ ref=d n.r.e.).  Dr. Jackson testified that if he had known
Axelrad suffered from an Ainflammatory condition,@ he Awould have taken a different tact.@ 
Viewed in context, this quoted testimony does not refer to the recommended
colonoscopy or the 1994 proctoscopy, which apparently revealed no
abnormalities.  Further, while experts
testified that such information would have been helpful in forming a
differential diagnosis, there is no evidence that knowledge of the three-year-old
proctoscopy or recommended colonoscopy would have changed Dr. Jackson=s treatment of Axelrad.  See Pratt, 444 A.2d at 686B87. 
Accordingly, there is no evidence of causation.

D. 
Lax Care of Health

In his brief, Dr. Jackson mentions that Axelrad=s lax care of his health over the
years was contributory negligence:  AInstead of treating a compliant patient
who took responsibility for his own health, [Dr. Jackson] was faced with a male
patient over fifty years old who had not scheduled a yearly physical exam in
six years.@ 
At trial, Dr. Jackson extensively argued this theory to the jury:

Workaholics, especially in the case of Dr. Axelrad, is
[sic] one who didn=t take care of himself and didn=t seek out his own healthcare as he appropriately
should have done.  

What we know is there is no time when he got himself
into the doctor=s office for a full physical examination between 1991
and 1997.  He=s a man in his fifties.  As the medical testimony has told you, those
are people who need to have yearly physical examinations and workups, but he
didn=t do that. . . . That=s not what
a reasonable and prudent person should do and he bears responsibility for the
culmination of what that caused.  

What did it cause in this case? . . . [I]t caused him
to begin the process of diverticulitis, which did not get diagnosed until he
needed an operation.  That=s what it caused. 
In the question we are asked: Was Dr. Axelrad negligent?  The answer to that question is yes.  Why? 
Because he didn=t seek out the appropriate medical care in order to
avoid the operation.

. . . .

Getting in there early takes responsibility by the
patient.  The patient has a duty to seek
out medical care and to do that on a routine basis in order to avoid problems
that we have in this particular case . . . .








I believe very
strongly. . . that the answer to Question No. 2, that the responsibility should
rest solely on Dr. Axelrad.  I believe
the primary person who could have avoided all of this would have been Dr.
Axelrad.

. . . I believe that no amount should be awarded in this case
because I don=t think that if we don=t take responsibility for our own
health care that we should blame others.

Although
a patient=s contributory Anegligence can serve to diminish
recovery under modern comparative negligence principles, it is patently clear
that such negligence must be contemporaneous with the malpractice of the
physician.@ 
Lambert, 616 N.E.2d at 976. 
In other words, the contributory negligence Amust have been simultaneous and co‑operating
with the alleged fault of the defendant, must have entered into the creation of
the cause of action[,] and must have been an element in the transaction which
constituted it.@  Sendejar, 555
S.W.2d at 885 (error to submit contributory negligence question to jury in
medical malpractice suit where plaintiff=s car wreck necessitated treatment by
defendants).  A[I]f the patient=s negligent act merely precedes that
of the physician and provides the occasion for medical treatment, contributory
negligence is not a permissible defense.@ 
Weeda, 521 A.2d at 1167.  AHence, it is improper to suggest, as
defendant did at trial, that negligent conduct of the patient prior to coming
under the care of the defendant physician could serve to constitute negligence.@ 
Lambert, 616 N.E.2d at 976. 
ASick people deserve the same care
whether they smoke, drink, drive too fast, or engage in socially unacceptable
behavior.@  Id. Again, we see no reason to depart from
standards outlined by sister jurisdictions. 
Accordingly, Axelrad may not be considered comparatively negligent for
being inattentive to his health before seeking Dr. Jackson=s professional opinion and medical
care.

E.  No
Reasonable Inference








The dissent concludes Axelrad negligently failed to reveal
relevant medical history.  First, based
on a conflict between Axelrad=s deposition and trial testimony, the dissent suggests that
Axelrad had a duty to volunteer information regarding the specific origin of
his abdominal pain.  Axelrad failed to
mention that he informed Dr. Jackson about the origin of pain in the left lower
quadrant of his abdomen during his pre-trial deposition.  However, Axelrad gave the following
contradictory trial testimony:  AI told [Jackson] that it started off
with left lower quadrant pain initially Sunday night, then became diffuse . . .
.@ 
The dissent concludes this testimony provides the basis for the jury to
infer that Axelrad understood the diagnostic significance of abdominal pain
originating in the left lower quadrant when he called Dr. Jackson.[10]

Although circumstantial evidence may be used to establish any
material fact, it must transcend mere suspicion.  Lozano v. Lozano, 52 S.W.3d 141, 149
(Tex. 2001) (Phillips, C.J., concurring & dissenting).  An inference is a deduction from proven
facts.  Id. (citing Joske v.
Irvine, 44 S.W. 1059, 1064 (Tex. 1898)). 
Any inference drawn from circumstantial evidence must be fair and
reasonable.  See Blount v. Bordens,
Inc., 910 S.W.2d 931, 933 (Tex. 1995). 
Otherwise, the inference is merely a guess and is, in legal effect, no
evidence.  Lozano, 52 S.W.3d at
148.[11]  Here, Axelrad=s testimony that he reported left
lower quadrant pain tells us nothing, one way or another, about whether he
recognized its significance.  Any
inference from this testimony is simply a guess. 








Further, there are at least three items of direct evidence
which render unreasonable and implausible the dissent=s suggestion that circumstantial
evidence will support the inference Axelrad understood the diagnostic
significance of left lower quadrant pain and the 1994 recommendation of
a colonoscopy, but failed to timely provide the information to Dr. Jackson: (1)
the mere fact that Axelrad was in excruciating pain when he contacted Dr.
Jackson and sought treatment; (2) testimonyCfrom both Axelrad and Dr. JacksonCthat Axelrad=s erroneous self-diagnosis at the
time he called Dr. Jackson was a condition called Arebound,@ cf. Wal-Mart Stores, Inc. v.
Miller, 102 S.W.3d 706, 710 (Tex. 2003) (inference about plaintiff=s lack of knowledge was unreasonable
in light of undisputed evidence); and (3) Axelrad=s answer to the following questions
during direct and cross examination:

Q.        Now, since that night, since youBafter you
go to the hospital, then what happens?  What do you learn?

A.        Well, Mr. Chandler, I learned that I had been suffering from
diverticulitis for a significant period of time

           * * * * *

Q.        (By Mr. Sprott) And, in fact, Doctor, I asked you on that
Monday what you were feeling and you said diffuse abdomen pain, correct?

A.        Correct.

Q.        I asked you if it was in the upper and lower quadrants.  And you answered what?

A.        I don=t have the B

Q.        You answered yes?

A.        Yes.

Q.        I asked you if it was on the left and the right and you
answered yes, didn=t you?

A.        Yes.

Q.        Now, you knowBat
least I hope by nowBthat that=s not a
classical finding for diverticulitis, is it?

A.        No.

Q.        A classic finding for diverticulitis based upon your
knowledge is you are going to have left lower quadrant pain, correct?

A.        Correct.    








This direct evidence flies in the face of the dissent=s conclusion that there is some
circumstantial evidence from which the jury may reasonably infer Axelrad
understood the significance of unreported history when he was in excruciating
pain.  Accordingly, the dissent=s suggestion that we must defer to
the jury finding under the equal inference rule is misplaced.  Lozano, 52 S.W.3d at 147.  In the instant case, there is no equal
inference when direct evidence trumps and supervenes the purported inference
from circumstantial evidence. Any such inference is patently unreasonable. 

In cases of only slight circumstantial evidence, something
else must be found in the record to corroborate the probability of the fact=s existence or non-existence. Id.  We must consider the totality of the known
circumstances in determining legal sufficiency of the circumstantial evidence
and the reasonable inferences to be drawn therefrom.  See Felker v. Petrolon, Inc., 929
S.W.2d 460, 464 (Tex. App.BHouston [1st Dist] 1996, writ denied).

Moreover, hospital records indicate that Axelrad complained: AI have a belly ache.@ Nothing in Axelrad=s words or actions supports an
inference that he knew the significance of left lower quadrant pain.  Inferences that are not reasonable and
logical cannot support a jury=s finding.  See
Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 392 (Tex. 1997).

Clearly, the dissent believes Axelrad is untruthful.  Our colleague gleans Ainferences@ for the jury from inconsistencies in
medical records, deposition and trial testimony.  However, inferences must be deduced from the
evidence.  Lozano, 52 S.W.3d at
149.  Discrepancy between pre-trial and
trial testimony is not, in and of itself, evidence.  Instead, the discrepancy goes to Axelrad=s credibility, which solely the jury
assesses.  Gorges Foodserv., Inc. v.
Huerta, 964 S.W.2d 656, 670 n.9 (Tex. App.CCorpus Christi 1997, no pet.)
(discrepancy between interrogatory answer and trial testimony); see Kratz v.
Exxon Corp., 890 S.W.2d 899, 903 (Tex. App.CEl Paso 1994, no writ) (conflicts
between statements); Gray v. Ford, 783 S.W.2d 214, 217 (Tex. App.CHouston [1st Dist.] 1990, no writ)
(discrepancy between deposition and trial testimony).  At most, the discrepancy reflects that
Axelrad learned the importance of left lower quadrant pain by the time of trial
and adjusted his testimony accordingly.








Next, the dissent imputes knowledge to Axelrad from other
physicians= testimony that left lower quadrant
pain is a classical symptom of diverticulitis. 
From these physicians= testimony, the dissent infers that (1) medical doctors know
the classic presentation of diverticulitis, and (2) because Axelrad, as a
psychiatrist, has a medical degree, he too knew the significance of left lower
quadrant pain.  This is an impermissible
stacking of inferences and is not legally sufficient evidence.  Marathon Corp. v. Pitzner, 106 S.W.3d
724, 728 (Tex. 2003) (also noting that Asome suspicion linked to other
suspicion produces only more suspicion, which is not the same as some evidence.@)

The dissent refers to a three-year-old proctoscopy for rectal
bleeding (that is, hemorrhoids) in which no abnormalities were found.  At that time, the physician recommended that
a colonoscopy be performed within two years. 
From this, the dissent suggests the jury could reasonably infer that
Axelrad was aware of Aproblematic bowel history@ which he should have reported
without any prompting.  Additionally, the
dissent suggests the record reflects that Dr. Jackson could have accurately
diagnosed Axelrad=s condition if he had been Aaware@ of Aadditional medical history@ that was documented after Axelrad
was admitted to the hospital.  Notably,
Dr. Jackson ordered a CT-scan after becoming Aaware@ of this purported Aadditional history.@  
However, the record reflects that after reviewing additional
history and the CT-scan results, Dr. Jackson=s impression was Adiagnosis probably not diverticulitis.@ 








Lastly, the dissent=s reliance on Elbaor is
misplaced.  She suggests that the court
avoid attempts to identify and define the duty relative to Dr. Jackson=s claim of comparative negligence
against Axelrad. Respectfully, our dissenting colleague unnecessarily raises
concerns about Aunwieldy and imprudent legal standards@ in professional malpractice
cases.  We have not altered the standard
of care for physicians in Texas.  We have
confined our analysis to a determination of whether there is any evidence to
support the duty element of an ordinary negligence claim against a patient.  Consistent with the standard of review for
legal sufficiency, we have searched the record for evidence supporting Dr.
Jackson=s claim that Axelrad breached a legal
duty.  Accordingly, it was necessary for
us to define Axelrad=s duty under the facts of this case. 

Succinctly, our dissenting colleague believes the negligence
finding against Axelrad is supported by an inference from circumstantial
evidence.  Consistent with our standard
of review, have searched the record for any direct or circumstantial evidence
which supports a negligence finding against Axelrad.[12]  We find no evidence to support assessment of
comparative negligence against Axelrad.

III.  Pathologist=s Testimony

In issues seven through ten, Axelrad challenges the
qualifications of Dr. Mary Schwartz, a pathologist, and the reliability of her
testimony.  A two‑part test governs
whether expert testimony is admissible: (1) the expert must be qualified; and
(2) the testimony must be relevant and based on a reliable foundation.  Helena Chem. Co. v. Wilkins, 47 S.W.3d
486, 499 (Tex. 2001).  Axelrad contends
Dr. Schwartz was not qualified to render an opinion that Axelrad suffered a
single bowel perforation before seeking Dr. Jackson=s help.  Axelrad=s contention is based on the
assertion that Dr. Schwartz did not have sufficient knowledge regarding the
etiology of diverticulitis.  We disagree
that Dr. Schwartz=s testimony should have been excluded.

A. 
Qualifications








AWhether a witness is qualified to
offer expert testimony is a matter committed to the trial court=s discretion.@ 
United Blood Serv. v. Longoria, 938 S.W.2d 29, 30 (Tex.
1997).  The trial court determines
whether the expert has Aknowledge, skill, experience, training, or education@ that would Aassist the trier of fact.@ 
See Tex. R. Evid. 702.  It is a proponent=s burden to establish an expert=s qualifications.  Broders v. Heise, 924 S.W.2d 148, 151
(Tex. 1996).  Further, a proponent must
show that the expert possesses special knowledge on the very matter on which he
or she proposes to give an opinion.  Id.
at 152B53. 
We gauge abuse of discretion by whether the trial court acted without
reference to any guiding rules or principles. 
E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549,
558 (Tex. 1995).

In this case, the record[13]
reveals that Dr. Schwartz is a board certified pathologist at Baylor
University, where she is a full professor and holds an endowed chair.  Her sub-specialties include anatomic
pathology and cytology, the study of cells taken in biopsy.  She has written several articles about
gastrointestinal cytology, and she is familiar with pathology of the
gastrointestinal tract.  She testified
that it is within a pathologist=s area of expertise to estimate the age of a perforation
based on examination of cells taken from a colon.  Specifically, Dr. Schwartz testified that a
pathologist looks for Aacute inflammatory cells@ (pus), which appear within one to two
days after an injury; macrophages, which appear after the third day of injury;
new blood vessels, and chronic inflammatory cells and fibroblasts, which appear
a week or two after injury.  Further, the
surgeon who operated on Axelrad testified that Apathologists know more about@ dating such perforations.  Finally, Dr. Schwartz discounted Axelrad=s theory of a microperforation
followed by a larger perforation based on the amount and location of chronic
inflammatory cells and fibroblasts versus acute inflammatory cells. 

Based on this evidence, we conclude that the trial court did
not abuse its discretion in finding Dr. Schwartz qualified to testify about the
age of Axelrad=s perforation.  Lack of specialized training about the
disease process of diverticulitis is not fatal to Dr. Schwartz=s qualifications to testify in this
case.








B. 
Reliability

Next, Axelrad challenges the reliability of Dr. Schwartz=s opinion that pathological findings
were the result of a single perforation occurring at least a week before
surgery.  According to Axelrad=s expert, Dr. Steven Kanner, Axelrad
likely suffered a microperforation before he sought Dr. Jackson=s help.  According to Dr. Kanner, the enema prescribed
by Dr. Jackson then caused a macroperforation to occur for the first time or
caused the microperforation to enlarge significantly, spilling pus into Axelrad=s abdomen.  However, based on pathology revealing the
presence of chronic inflammatory cells and fibroblasts, Dr. Schwartz concluded
that Axelrad suffered a perforation before he sought Dr. Jackson=s help and before his enema. 

Although the trial court serves as an evidentiary gatekeeper
by screening out irrelevant and unreliable expert evidence, it has broad
discretion to determine the admissibility of that evidence.  Exxon Pipeline Co. v. Zwahr, 88 S.W.3d
623, 629 (Tex. 2002).  Some of the
factors a trial court should consider in determining reliability include: (1)
the extent to which the theory has been or can be tested; (2) the extent to
which the technique relies upon the subjective interpretation of the expert;
(3) whether the theory has been subjected to peer review and publication; (4)
the technique=s potential rate of error; (5)
whether the underlying theory or technique has been generally accepted as valid
by the relevant scientific community; and (6) the non‑judicial uses that
have been made of the theory or technique. 
Robinson, 923 S.W.2d at 557. 
In gauging reliability, the trial court evaluates the methods, analyses,
and principles relied upon in reaching the opinion, ensuring Athat the opinion comports with
applicable professional standards outside the courtroom and that it will have a
reliable basis in the knowledge and experience of the discipline.@ 
Helena Chem. Co., 47 S.W.3d at 499 (quoting Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 725B26 (Tex. 1998)). 








Axelrad contends that Dr. Schwartz=s methodology was fallacious because
she assumed all pathological findings were related to a single
perforation.  After reviewing the
evidence, we do not agree that Dr. Schwartz=s methodology rendered her opinion
unreliable.  Dr. Schwartz observed acute
inflammatory cells on specimen tissue taken from Axelrad=s colon.  She also saw new blood vessels, histiocytes,
chronic inflammatory cells, and fibroblasts. 
Based on her observations, she estimated a perforation that was one to
two-and-a-half weeks old.  When
questioned whether Axelrad may have suffered a microperforation, which
partially healed, followed by a larger perforation in the same site after the
enema, Dr. Schwartz discounted such a theory. 
For such an event, she would expect the acute inflammatory cells to be
located differently and a lesser amount of granulation tissue, which is created
by fibroblasts.  Further, Dr. Schwartz
explained it was unlikely that a larger perforation occurred near an earlier
microperforation: AIf there were a second perforation nearby, I would expect to
find an area of neutrophils without the surrounding granulation tissue, which I
do not see.@ 
In short, she saw no microscopic evidence of a more recent perforation.

Additionally, at trial, Dr. Schwartz testified that since her
deposition, she reviewed six major texts (four on gastrointestinal pathology)
and five articles (including the standards of the American Society for
Colorectal Surgeons), but Amicro-perforation@ was not a term of common usage in
those writings.  She simply disagrees
with Axelrad=s expert, Dr. Kanner, who used the
term microperforation in his conclusions.








We agree with Dr. Jackson=s contention that Axelrad is actually
appealing the truth of Dr. Schwartz=s conclusions, not the reliability of
her opinion.  However, A[t]he trial court=s role is not to determine the truth
or falsity of the expert=s opinion.@  Robinson, 923
S.W.2d at 558; see Weingarten Realty Investors v. Harris County Appraisal
Dist., 93 S.W.3d 280, 285 (Tex. App.CHouston [14th Dist.] 2002, no
pet.).  In this case, Dr. Schwartz did
not merely assume a single perforation, but explained her opinion by the
pathology results she viewed in Axelrad=s slides.  She described the pathology that is expected
to be found if a microperforation occurs and is followed by a larger
perforation, either at the same site or within close proximity.  Further, Axelrad extensively cross-examined
Dr. Schwartz about her opinions and limitations of pathology.  Such cross-examination remains the
traditional and appropriate means to attack admissible, though perhaps shaky,
evidence.  Gammill, 972 S.W.2d at
727.  The trial court did not abuse its
discretion in admitting Dr. Schwartz=s testimony as reliable.

We overrule issues seven through ten.

IV.  Conclusion

We have overruled issues seven through ten because the trial
court did not abuse its discretion in finding Dr. Schwartz qualified and in
admitting her expert testimony as reliable. 
Following our survey of authority from sister jurisdictions, we sustain
appellant=s first six issues, and hold as
follows: (1) a patient may rely upon a physician to ask appropriate questions
about medical history; (2) a patient=s duty to cooperate involves
responding truthfully to a physician=s questions; (3) a patient has no
general duty to self-diagnose or volunteer information; (4) the duty to
volunteer information arises only when a patient understands the diagnostic
significance of unrevealed history and recognizes the physician has failed to
ascertain that history; and (5) in a misdiagnosis case, the patient may not be
assessed comparative negligence for being inattentive to his health before
seeking the physician=s professional opinion and care.








Viewing all the evidence and any reasonable inference
supporting the jury=s verdict, we find as follows: (1) there is no evidence Dr.
Jackson inquired about origination of Axelrad=s abdominal pain in the left lower
quadrant before Axelrad performed the enema; (2) there is no evidence Dr. Jackson
asked a question reasonably calculated to timely elicit a report of the 1994
examination for hemorrhoids and recommendation that a colonoscopy be performed
within two years; (3) there is no direct evidence and no reasonable inference
from circumstantial evidence that Axelrad was aware of the diagnostic
significance of left lower quadrant pain or his 1994 examination before he
performed the enema; and, finally, (4) there is no evidence in the record that
Axelrad untruthfully described his medical history before performing the
enema.  

Accordingly, we hold that the trial court erred by including
Axelrad=s name in the comparative fault jury
questions.  We reverse and remand for a
new trial.

 

/s/        Charles W. Seymore

Justice

 

Judgment rendered
and Majority and Dissenting Opinions filed June 29, 2004.

Panel consists of
Justices Anderson, Seymore, and Guzman. 
(Guzman, J., dissenting.)

 

 











[1]  The dissent
contends the majority opinion creates a Anew legal
standard for analyzing contributory negligence.@  On the contrary, this case involves
assessment of negligence and our legal sufficiency review requires us to
determine whether there is evidence sufficient to establish all of the four
elements of an ordinary negligence claim against Axelrad, one of which is Aduty.@  See Edward
D. Jones & Co. v. Fletcher, 975 S.W.2d 539, 542B43 (Tex. 1999). 
The existence of a legal duty is a threshold question of law based on
the specific facts of a case.  Kukis
v. Newman, 123 S.W.3d 636, 639 (Tex. App.CHouston
[14th Dist.] 2003, no pet.); see Thapar v. Zezulka, 994 S.W.2d 635, 637
(Tex. 1999).  A party cannot be found
negligent where no duty exists.  See
Thapar, 994 S.W.2d at 637.  This case
does not involve a Anew standard of care@ because
we are dealing with the duty of ordinary care assignable to a layman and gauged
by conduct society expects from a reasonably prudent person.  Accordingly, 
in this case of first impression, we will outline the patient=s duty to cooperate when the physician requests the
patient=s medical history. 





[2]  In Elbaor,
the physician contended the patient was negligent for failing to follow orders
and take medication.  Ordinarily, the
patient=s duty to follow the physician=s order and take medication would be triggered if the
physician simply prescribed medication. 
Absent evidence of miscommunication by the physician or misunderstanding
attributable to the patient, there is no obvious contingency or condition
precedent relative to the patient=s duty
to follow the doctor=s orders or take prescribed medication.  Accordingly, the patient=s duty is fully outlined under the standard definition
of ordinary care. However, in a misdiagnosis case where the physician claims
the patient was negligent for failing to disclose specific events or physical
conditions in his medical history, it is necessary for the court to identify
the circumstances under which a patient might breach the duty of ordinary
care.  For example, if the physician
fails to ask a particular question regarding origin or chronology of symptoms,
should the patient be assessed negligence if he does not volunteer the information?  What if the patient fails to report specific
events in his medical history because he does not understand the diagnostic
significance of the information? Obviously the patient=s duty under an ordinary negligence standard is more
difficult to define.  However, no Anew standard of care@ is
created when the court defines circumstances under which a patient breaches the
duty to cooperate in a misdiagnosis case.





[3]  Dr. Jackson
cites Carreker for the proposition that a patient has a general duty to
fully disclose his or her symptoms.  In
the plurality opinion, the court fails to detail the questions asked of the
patient who was misdiagnosed with gastroenteritis instead of appendicitis.  Further, in this nine-judge opinion by the
Georgia court, four dissented and four concurred. 





[4]  The dissent
misinterprets our holding with the following assertion: ARequiring physicians to ask specific questions in
excess of those required by the applicable standard of care would impose
unnecessary burdens on the doctor-patient relationship and add inefficiencies
to the healthcare system.@  Respectfully,
our colleague has focused her concern on an issue which is not presented by the
litigants or addressed in this opinion. 
Apparently, our colleague refuses to acknowledge that assessment of
negligence against a physician is based on standards of care which are
the subject of expert testimony.  In a
medical malpractice case, the physician=s liability is measured by standards of care in the
profession whether the patient is comatose or capable of reporting, in
explicit detail, all of his medical history. 
This case involves assessment of negligence against the patient
under the Aperson of ordinary prudence@ standard.  We
reject our colleague=s contention that the majority has created a Anew legal standard of care.@  By suggesting
that a Anew standard@ will
impose new duties on doctors to ask precise questions of their patients, the dissent
fails to understand that our legal sufficiency review involves a search of the
appellate record for evidence to support Dr. Jackson=s specific allegations
of negligence against Axelrad.  In
determining whether the evidence is legally sufficient to support assessment of
any negligence against Axelrad, we are properly searching the record for
evidence supporting Dr. Jackson=s contention that his patient breached a duty
to report abdominal pain originating in the left lower quadrant and to report a
1994 visit to another physician.  As in
all negligence cases, we must determine if there is any evidence establishing duty,
the first element of a negligence cause of action.   In this case, the patient=s duty to truthfully report history and symptoms is
triggered when the physician asks a question reasonably calculated to elicit
the information needed for an accurate diagnosis.  Our determination of whether there is any
evidence that a duty was breached is based on the well-known legal sufficiency
standard of review; not, as the dissent suggests, create an Aunwieldy and imprudent legal standard for determining
the legal sufficiency of the evidence of contributory negligence in
professional malpractice cases.@        





[5]  Disregarding
chronology, the dissent labors long and hard with references to Axelrad=s deposition and trial testimony in an effort to
demonstrate that the record supports the following inference:  on the occasion in question, Axelrad
understood the significance and had a duty to report that his abdominal pain originated
in the left lower quadrant. 





[6]  In contrast,
at Healthsouth, where Axelrad underwent an ultrasound on Tuesday, a patient
questionnaire was completed.  In the
Healthsouth questionnaire, Axelrad responded to a question regarding his initial
symptoms.  He wrote that his symptoms
began with Aonset of malasia [sic] followed by pain.@  AMalaise@ means a
feeling of bodily discomfort. 





[7]  The dissent
effectively concedes there is no evidence in the appellate record that Dr.
Jackson asked appellant about origin of pain in the left lower quadrant of his
abdomen.  However, our colleague believes
Dr. Jackson=s testimony that he routinely asks patients about any
other problems they may have experienced since their last visit provides some
evidence that Axelrad was Aafforded@ the Aopportunity to respond, disclosing both his pain and
his history.@   Our colleague
seems most willing to allow an open-ended question by the physician to serve as
a trigger establishing the patient=s duty
to provide relevant and learned responses that fit a diagnostic protocol
obviously known only to a qualified expert. 
Based on our survey of authority from sister jurisdictions and proper
application of the standard of review for legal sufficiency, we respectfully
disagree.





[8]  The dissent
does not refer to any evidence in the record that Dr. Jackson timely asked a
question reasonably calculated to elicit information pertaining to Axelrad=s 1994 proctoscopy where the problem was identified as
hemorrhoids.





[9]  The dissent
believes there is evidence sufficient to support a reasonable inference that
Axelrad understood the importance of certain symptoms but failed to volunteer
that information.  Our colleague
concludes: ADr. Axelrad did not disclose his history of bowel
problems to Dr. Jackson during his initial presentation.@  Notably, in
her search for evidence to support this inference, our colleague disregards Dr.
Jackson=s trial testimony regarding Mrs. Axelrad=s statements during the August 19, 1997 office
exam.  Dr. Jackson testified as follows: AMrs. Axelrad, in talking to me, said Dr. Axelrad has
spent long times in the bathroom, like 30 and 45 minutes at a time.  And he--she characterized it as weird bowel
habits.  I asked a little bit further,
and it sounds like he was having a lot of action even before this time I had
seen him, more than she thought was normal, and that=s why I assume she characterized it as weird.@





[10]  According to
the dissent, the jury could disbelieve Axelrad=s trial
testimony that he informed Dr. Jackson about the left lower quadrant pain, but
paradoxically infer from his incredulous assertion the unsupportable conclusion
that he understood the diagnostic significance of left lower quadrant pain,
when he first contacted Dr. Jackson. Such inference is patently unreasonable.





[11] Application of the equal inference rule in Lozano involved
conduct and contradictory testimony of several witnesses.  This case involves the impeached or
contradictory testimony of one witness.  





[12]  We have
considered all the evidence in a light most favorable to the jury=s verdict.  Our
reference to specific items of evidence and testimony which do not favor the
jury=s verdict should be viewed as responses to the dissent=s conclusion that the jury may infer certain facts
from circumstantial evidence.





[13]  The record
includes both pre-trial and trial evidence pertinent to Axelrad=s motion to exclude.